# Illinois Official Reports

## Appellate Court

---

### *People v. Zareski*, 2017 IL App (1st) 150836

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Respondent-Appellee, v. BRANDON ZARESKI, Petitioner-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-15-0836 |
| Filed | August 1, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-11452; the Hon. Joseph Kazmierski, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Stephanie T. Puente, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Joseph Alexander, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Justices Neville and Pierce concurred in the judgment and opinion. |

## OPINION

¶ 1    Brandon Zareski was convicted of first degree murder for shooting Jonathan Nieves. Zareski hired his own counsel, Scott Frankel, to represent him on direct appeal, and we upheld his conviction in *People v. Zareski*, 2012 IL App (1st) 102102-U. Zareski again retained Frankel to file a postconviction petition, which the trial court dismissed at the second stage of proceedings. Zareski now appeals from that dismissal.

¶ 2    Zareski first argues that Frankel had a "*per se*" conflict of interest by acting as both direct appeal and postconviction attorney. But this situation does not fit in the restrictive category of *per se* conflicts. Nor has Zareski shown that Frankel labored under an actual conflict of interest that had an adverse effect on his representation. Also, contrary to Zareski's contention, Zareski has failed to make a substantial showing of a claim of actual innocence. His claim that his trial counsel was ineffective for failing to impeach State witnesses with photographs purporting to show their gang affiliations is barred by *res judicata*.

¶ 3    In addition, Zareski argues that Frankel did not provide reasonable assistance of counsel as postconviction attorney. This case presented us with the unusual situation of a postconviction attorney who was retained by the petitioner to file the initial petition—most often, a postconviction petition is filed *pro se*, and counsel is only appointed or retained at the second stage of proceedings. Illinois Supreme Court Rule 651 (eff. Dec. 1. 1984) was written to address that most common situation, and both the rule and the cases interpreting Rule 651 do not quite fit with Frankel's status. Close review of the rule and case law lead us to conclude that, although Frankel was required to provide Zareski with a reasonable level of assistance, Rule 651 does not specifically apply when petitioner's retained counsel files the initial petition. Given this, we asked the parties to file supplemental briefs on the standard under which we should evaluate Frankel's assistance. Based on these briefs, and our own research, we conclude that we should use a *Strickland*-like standard, and under that standard we reject Zareski's unreasonable-assistance claims.

¶ 4    Zareski argues that Frankel should have raised certain claims in the postconviction stage, or raised them differently. We reject the claim that Frankel should have argued that trial counsel should have cross-examined a state witness about the victim's gun because it would not have benefited the defense. Zareski's counsel on appeal has not provided a legal basis on which trial counsel could have moved to suppress the statements of state witnesses, so we will not say that Frankel should have raised this claim. Zareski cannot show that he was prejudiced by Frankel's raising claims in postconviction that were barred by *res judicata*. Since Zareski has not raised a colorable claim of actual innocence, we cannot hold that Frankel was ineffective for failing to make that claim "freestanding." Finally, Zareski asserts that Frankel should have raised an ineffective assistance of counsel claim for his trial counsel's failure to apprise him of the sentencing range, so that Zareski could make a proper waiver of his right to a second degree murder instruction. His assertion is without merit because a defendant does not have the right to decide whether he or she wants the instruction on the lesser-mitigated offense of second degree murder, and does not need to knowingly waive the instruction.

¶ 5                              BACKGROUND

¶ 6                             Trial Proceedings

¶ 7        At his trial, Zareski was represented by privately retained counsel.

¶ 8        Chicago police officer Hallinan testified that on April 15, 2008, he was on duty, driving his squad car north on Laramie Avenue. Shortly before midnight, he heard gunshots, and as he passed through the intersection of Roscoe Street and Laramie, he saw people running. Hallinan stopped and found a man (the victim, Jonathan Nieves) lying face down in front of the door of 3405 North Laramie, bleeding from a large hole in the back of his head. Next to Nieves lay a handgun. Hallinan called for help and stayed with the body.

¶ 9        Police detective Edward Schak arrived and recovered the handgun. It was unloaded, and there were no bullets in the chamber or in the magazine. The parties stipulated that the handgun was a semiautomatic firearm with no ammunition, and it was inoperable because the thumb safety lever and firing pin were broken. Bullet fragments found at the scene did not come from that gun. No fingerprints were on the gun, although gunshot residue was found on Nieves's hand.

¶ 10       Orlando Crespo testified that he met Nieves through a mutual friend and had known him about a month. On April 15, 2008, he was in Nieves's apartment using the computer. Nieves's girlfriend, Krystle LaBombard, was in another room with her children. Crespo heard a commotion outside and people talking; Nieves went to the window, and Crespo followed, looking over Nieves's shoulder. The window faced the corner of Roscoe and Laramie. Crespo saw a man (whom he identified as Zareski) standing on the corner; the man was arguing about "gang related issues" with Nieves. Zareski flashed gang signs at Nieves, and Nieves yelled back "deuce killer." Nieves told Crespo "that's Brandon down there that used to be a four."

¶ 11       Nieves went downstairs. Crespo followed. When Crespo got outside, he saw Zareski standing on the corner and firing a handgun in Crespo's direction. Crespo heard between four and six shots. Crespo had never seen Zareski before that night. The shooter was light-skinned, but Crespo could not tell his nationality, and wearing a white or light gray sweater with different colored patches. He had old English numbers (a 9, 6, or 4) tattooed on his hands. Crespo saw a charcoal gray Malibu, with its headlights out, moving east on Roscoe. He told police that two people were in the front seat and at least one in the back seat, and the driver stuck his left arm out the window and put up four fingers (as a gang sign for the Four Corner Hustlers).

¶ 12       Crespo saw Nieves trying to run back to the apartment building door. Crespo started to run upstairs but then saw Nieves lying on the ground. Crespo did not see where Zareski went after the shooting. Crespo went to LaBombard and told her that Nieves had been shot; LaBombard began to cry and pulled the blinds to see outside. Crespo did not see Nieves with the gun until after the shooting and had not seen Nieves pick up a gun before leaving the apartment.

¶ 13       The police arrived quickly. Crespo gave a written statement, and a few hours later, he identified Zareski in a photo array. On May 21, 2008, Crespo identified Zareski at a lineup. Crespo also testified at the grand jury. He admitted that in his previous statements, he had not said that Zareski had fired the gun at him or that he had gone outside the building.

¶ 14       Crespo was asked whether Nieves's nickname, "Pun," was gang-related and short for "Punisher." Crespo denied this but said that the commotion outside the building was gang-related "from my knowledge, yeah. I don't gang bang."

¶ 15    The parties stipulated that Crespo previously stated that Nieves had been arguing with Zareski from the window, then Nieves stated that he would "fuck with him" before rushing out of the apartment. Crespo testified that he did not remember Nieves saying this.

¶ 16    Krystle LaBombard testified that she lived in the apartment with Nieves and her children. That evening, LaBombard awoke in bed when she heard noises and people talking outside, the sound of someone going downstairs, then two gunshots. LaBombard ran out of the bedroom and met Crespo entering the apartment; Crespo told her that Nieves was downstairs. LaBombard pulled the blinds off the front window, which looked out on Laramie, and saw someone (whom she identified as Zareski) aiming a gun toward the building's front door. She saw sparks coming from the gun. The shooter was wearing a white hooded sweatshirt with designs on it. LaBombard also saw a dark colored car driving east on Roscoe with its lights off. She saw Nieves on the ground and Zareski going toward the car and getting inside.

¶ 17    LaBombard went downstairs and was met by police; she told them that "Grumpy" was the shooter. She saw the gun on the ground, but told police that she had never seen that gun before and had not seen Nieves with a gun that day. She had previously heard Nieves talk about the shooter driving near their home. A few hours later, she identified Zareski in a photo array, and identified him in a lineup. LaBombard admitted that she had told the police that she had heard only one gunshot.

¶ 18    Police also testified that a gray Chevrolet Malibu was registered to Zareski's home address and was found in the garage. The parties stipulated that the Malibu was registered to Zareski's parents. Police also testified that LaBombard told them the shooter's nickname was "Grumpy," and police constructed the photo array based on that nickname.

¶ 19    At the jury instruction conference, the State prepared an instruction on second degree murder, and the trial court offered to give it. Zareski's trial counsel stated that he did not want a second degree instruction, and the trial court asked if he had discussed it with Zareski. Counsel stated that he had discussed it, but would do so again. After an off-the-record conversation, counsel stated that he again had discussed it with Zareski and Zareski did not want the instruction. The trial court addressed Zareski directly: "I want to make sure you know what that means is under certain circumstances based upon the evidence that you ask and your attorney ask for a second-degree instruction, I can give it, but I'm not going to give it unless you ask for it. Is it your decision not to ask for the second-degree instruction today?" Zareski replied "yes."

¶ 20    The jury convicted Zareski of first degree murder, and the trial court sentenced Zareski to 24 years of imprisonment.

¶ 21                        Zareski Hires New Counsel for Posttrial Proceedings

¶ 22    Zareski retained new counsel, Scott Frankel, to represent him during the posttrial proceedings. In Zareski's posttrial motion, Frankel raised several claims that trial counsel had provided ineffective assistance. The trial court denied this motion.

¶ 23    Frankel represented Zareski on direct appeal and raised several claims of ineffective assistance of counsel: (i) trial counsel should not have introduced prior consistent statements from LaBombard or testimony helpful to the State, (ii) trial counsel failed to question Crespo and LaBombard about their gang affiliations or introduce social media photographs of them showing gang signs, (iii) trial counsel failed to interview and present two potential defense

witnesses, and (iv) trial counsel conceded, in response to a jury question, that Zareski was the shooter. *Zareski*, 2012 IL App (1st) 102102-U, ¶¶ 50-54. The appellate court assumed for the sake of argument that these errors had been committed but rejected the claims: "we remain unconvinced that the presentation of this additional evidence would have created the requisite 'reasonable probability' that the outcome of the trial would have been different." *Id.* ¶ 55.

¶ 24 In support of his additional argument that the evidence was insufficient to convict, Frankel argued that both Crespo and LaBombard were not credible due to their gang affiliations, proven by their social media photographs. But, the appellate court would not address this contention because those photographs had not been part of the trial record. *Id.* ¶ 32. The appellate court affirmed Zareski's conviction.

¶ 25 Frankel Continues to Represent Zareski in Postconviction Proceedings

¶ 26 In March 2013, Frankel filed a postconviction petition (later amended and supplemented). Combined, the petitions raised a number of claims that Zareski's counsel had provided ineffective assistance and that Zareski was actually innocent of the crime. First, his trial counsel should have moved to suppress the lineups at which Crespo and LaBombard identified Zareski. Second, he should have requested the second degree murder instruction. Third, he should have cross-examined Crespo regarding Nieves's gun: Crespo had told the State that before the day of the shooting, Nieves had shown Crespo an inoperable gun. Fourth, he should have located and interviewed potential witness Mayra Mandujano, whose affidavit stated that she witnessed the shooting from her own apartment and saw Nieves firing a gun.

¶ 27 The postconviction petitions also included some claims that had been previously raised on direct appeal. And, the petitions argued that Mandujano's potential testimony would have shown that Zareski was actually innocent of the crime.

¶ 28 The State moved to dismiss the petition, which the trial court granted, holding that (i) the claim regarding the gang photos was barred by *res judicata*, (ii) the petition offered no legal basis on which his counsel could have moved to suppress the lineups, (iii) the second degree murder instruction was a strategic decision made by his counsel, (iv) Mandujano's potential evidence was not conclusive enough to show actual innocence, and (v) in any event, the actual innocence claim was not "freestanding."

¶ 29 STANDARD OF REVIEW

¶ 30 We review the trial court's dismissal of a postconviction petition at the second stage *de novo. People v. Pendleton*, 223 Ill. 2d 458, 473 (2006).

¶ 31 ANALYSIS

¶ 32 Under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2014)), a convicted defendant may assert a substantial denial of his or her constitutional rights in the proceedings leading to the conviction. *People v. Roman*, 2016 IL App (1st) 141740, ¶ 11. At the first stage, the petition must set forth the "gist" of a constitutional claim; if it does so, the petition advances to the second stage, where the State may answer it or move to dismiss. *Id.* ¶ 12. If the petition makes a "substantial showing" that a constitutional violation occurred, the petition moves to the third stage, where the trial court may hold an evidentiary hearing. *Id.*

¶ 33　　　　　　　　　　　Did Frankel Have a Conflict of Interest?

¶ 34　　　Zareski first claims that Frankel, by serving as both direct appeal counsel and postconviction counsel, suffered from a disabling *per se* conflict of interest, and that Zareski is thus entitled to automatic reversal. Alternatively, Zareski argues that Frankel suffered from an actual conflict of interest and we should reverse because the conflict adversely affected Frankel's performance. The State argues that Zareski forfeited the actual conflict of interest argument by not raising it until his reply brief, but we will address it because forfeiture binds the parties, and not the court. *People v. McCarty*, 223 Ill. 2d 109, 142 (2006).

¶ 35　　　Postconviction petitioners have the right to reasonable assistance from their counsel, and this includes the "correlative" right of conflict-free representation. *People v. Hardin*, 217 Ill. 2d 289, 300 (2005). The most serious type of conflict is the *per se* conflict: one in which "facts about a defense attorney's status *** engender, by themselves, a disabling conflict." (Emphasis omitted and internal quotation marks omitted.) *People v. Hernandez*, 231 Ill. 2d 134, 142 (2008). If a *per se* conflict exists, the defendant is entitled to automatic reversal and need not show that the attorney's performance was affected by the conflict. *Id.* at 143.

¶ 36　　　Our supreme court has identified three situations causing a *per se* conflict: (i) defense counsel has a prior or contemporaneous relationship with the victim, prosecution, or entity assisting the prosecution; (ii) defense counsel contemporaneously represents a prosecution witness; and (iii) defense counsel was a former prosecutor who had been personally involved in the defendant's prosecution. *People v. Taylor*, 237 Ill. 2d 356, 374 (2010). Zareski asks us to add a fourth category: when defense counsel must argue his or her own ineffectiveness. Some courts have held that a *per se* conflict arises in that situation. See, *e.g.*, *People v. Keener*, 275 Ill. App. 3d 1, 5 (1995). But we find this contrary to logic: "[a] *per se* conflict of interest does not exist merely because a defense attorney's competence is questioned by his [or her] client during posttrial proceedings." (Internal quotation marks omitted.) *People v. Perkins*, 408 Ill. App. 3d 752, 762 (2011). The supreme court has deliberately limited *per se* conflicts to three specific situations.

¶ 37　　　*People v. Lawton*, 212 Ill. 2d 285 (2004), which Zareski cites at length, does not change our conclusion. In *Lawton*, the supreme court called it an "inherent" conflict of interest for an attorney to argue his or her own ineffectiveness. *Id.* at 296. But, as *Perkins* points out, that ruling was in the context of deciding whether Lawton had forfeited his ineffective assistance claim. "It is far from clear that the recognition of a conflict of interest in the context of forfeiture or the context of an attorney representing a defendant on appeal or other postjudgment proceedings, means that it is a constitutional *per se* conflict of the sort warranting automatic reversal outside those situations." *Perkins*, 408 Ill. App. 3d at 762. The supreme court in *Hernandez* certainly could have used *Lawton*'s holding to add another category of *per se* conflict, but the court declined the opportunity.

¶ 38　　　Rather, we believe this situation is best examined as an actual conflict of interest. Instead of automatic reversal, Zareski must show "some specific defect in his counsel's strategy, tactics, or decision making attributable to the conflict." *People v. Spreitzer*, 123 Ill. 2d 1, 18 (1988); *Taylor*, 237 Ill. 2d at 380 (applying actual conflict of interest test where attorney represented both Taylor and codefendant). Zareski is not required to prove that the conflict contributed to his conviction (*Spreitzer*, 123 Ill. 2d at 19) but must do more than proffer "[s]peculative allegations and conclusory statements" to prove that Frankel's performance was affected by the conflict (*People v. Morales*, 209 Ill. 2d 340, 349 (2004)).

¶ 39 Zareski alleges that he has met the test because Frankel did not argue that direct appeal counsel (himself) was ineffective to overcome procedural default of some postconviction claims. The State, on the other hand, argues that we must look at the merits of the defaulted claim to determine whether Frankel's performance had a "specific defect." Using a layered approach to review an attorney's performance makes the most sense. For instance, when a defendant claims that direct appeal counsel was ineffective for failing to raise a claim, we examine the underlying claim to determine if that attorney's performance was deficient. See, *e.g.*, *People v. Cole*, 2012 IL App (1st) 102499, ¶ 18. When a defendant claims that a trial attorney should have filed a particular motion, the reviewing court needs to determine whether the motion would have been meritorious before it can determine whether the attorney should have filed it. See, *e.g.*, *People v. Henderson*, 2013 IL 114040, ¶ 15.

¶ 40 We will follow the same approach. While mindful that Zareski does not need to prove "prejudice" in the same sense as a regular ineffective assistance claim, we must at least look at the underlying claims to determine if Frankel should have raised them. Otherwise, we run the risk of forcing the trial court on remand to evaluate claims that have no chance of success in a new postconviction petition. Other courts have applied this approach in either accepting or rejecting actual conflict of interest claims. See, *e.g.*, *People v. Williams*, 139 Ill. 2d 1, 12-14 (1990) (rejecting claim that trial counsel should have cross-examined codefendant on particular issue because codefendant's testimony on point did not undermine defendant's position); *People v. White*, 362 Ill. App. 3d 1056, 1061 (2005) (trial counsel's cross-examination of state witness showed that trial counsel who represented both defendant and codefendant "sacrifice[d]" defendant in favor of codefendant, who was acquitted).

¶ 41 Specifically, Zareski points to Frankel's argument in postconviction that his trial counsel was ineffective for failing to cross-examine Crespo about his statement that Nieves had shown Crespo an inoperable gun. Zareski argues that Frankel had been ineffective on direct appeal for failing to raise the claim. This would have negated the forfeiture.

¶ 42 As explained, to determine whether Frankel's failure to do so was a "specific defect," we need to examine whether this claim would have been successful on direct appeal. The answer is it would not have been successful. The existence of the inoperable gun, and Nieves's access to it, was never in question at trial because an inoperable gun was found next to Nieves's body. Its existence was testified to by police witnesses, and the parties stipulated that it was inoperable and that gunshot residue was on Nieves's hand. No one testified or theorized that the handgun had been planted next to Nieves's body, so there was no need to confirm that he possessed it before the shooting. Zareski relied heavily on the handgun's existence in arguing that he shot Nieves in self-defense, but we cannot see how Crespo's testimony was necessary or even helpful to that argument. Since the claim would not have succeeded on direct appeal, it cannot have been a "specific defect" in Frankel's performance not to raise it.

¶ 43 Contrary to Zareski's representation, this was the only claim that the trial court refused to consider because it could have been, but was not, raised on direct appeal. Thus, it was the only claim potentially affected by the alleged actual conflict of interest.

¶ 44 Next, we will address Zareski's other contentions against Frankel's performance.

¶ 45 Did Frankel Provide "Reasonable Assistance" of Counsel in Postconviction?

¶ 46 Zareski argues that Frankel provided "unreasonable assistance" as postconviction counsel, in four ways: (i) he failed to argue that direct appeal counsel (himself) was ineffective for

failing to argue that trial counsel was ineffective for failing to cross-examine Crespo about the gun; (ii) he failed to argue that direct appeal counsel was ineffective for failing to argue that trial counsel was ineffective for failing to move to suppress the lineup identifications; (iii) he raised several ineffective assistance claims that were barred by *res judicata*, as they had already been raised and rejected on direct appeal; and (iv) he failed to raise the Mandujano claim as a "freestanding" claim of actual innocence. The State attacks these claims on their merits, but Zareski argues that we should not consider the merits at all. Rather, according to Zareski, we should look only at whether Frankel properly presented the claims, and if (as Zareski contends) Frankel failed to present the claims in their best light, we should automatically remand to the trial court without considering whether these claims would have had any chance of success in the trial court. While Zareski's argument is grounded in Illinois precedent, he misinterprets its scope.

¶ 47                      Should We Consider the Merits of Zareski's Claims?

¶ 48        First, some principles on which all agree. Under the federal constitution, defendants are guaranteed effective assistance of counsel at trial and on direct appeal. In extremely rare cases, if the attorney's performance was particularly egregious, defendants need not show that they were prejudiced by the deficient performance. See *United States v. Cronic*, 466 U.S. 48 (1984) (prejudice may be presumed if counsel entirely fails to subject State's case to meaningful adversarial testing); see, *e.g.*, *People v. Morris*, 209 Ill. 2d 137, 187-88 (2004) (prejudice presumed where defense counsel conceded client's guilt, pursued nonlegal plea for jury sympathy, and affirmatively introduced evidence of client's involvement in grisly unrelated murder, even though trial court had previously ruled that evidence inadmissible). The Illinois Supreme Court has made this finding only twice. *People v. Cherry*, 2016 IL 118728, ¶ 27.

¶ 49        In the vast majority of cases, a defendant alleging that counsel provided ineffective assistance must show that his or her counsel's performance fell below an objective standard of reasonableness and that there was a reasonable probability of a different outcome had counsel performed their duties. *Id.* ¶ 24 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). This *Strickland* standard applies to both trial and appellate counsel: to show that appellate counsel was ineffective for failing to raise a claim, or arguing it inadequately, the defendant must show a reasonable probability that the claim would have succeeded on direct appeal if raised. *Cole*, 2012 IL App (1st) 102499, ¶ 18.

¶ 50        Neither the federal nor state constitutions guarantee assistance of counsel in postconviction proceedings, and so we examine the performance of postconviction counsel by a third standard—"reasonable assistance." This standard (though inadequately defined) is lower than "effective assistance" under *Strickland*, as postconviction proceedings are a legislative grant, not a constitutional entitlement. *People v. Cotto*, 2016 IL 119006, ¶ 29. Strictly speaking, a defendant is entitled to less from postconviction counsel than from direct appeal or trial counsel. The flip side of this principle is that it should be even more difficult for a defendant to prove that he or she received unreasonable assistance than to prove that he or she received ineffective assistance under *Strickland*.

¶ 51        The performance of postconviction counsel has been standardized by Illinois Supreme Court Rule 651. Ill. S. Ct. R. 651(c) (eff. Dec. 1, 1984). That rule, by its text and history, assumes the most common scenario—a prisoner files a *pro se* postconviction petition, and the trial court may then appoint counsel to assist the prisoner by amending the petition. Appointed

counsel is required to consult with the petitioner to ascertain his or her contentions, examine the record of proceedings at trial, and make any amendments to the *pro se* petition that are necessary to adequately present the contentions. *Id.* Our supreme court has held that Rule 651 applies to counsel appointed or retained after a *pro se* petition, but not to counsel that was privately retained by the prisoner to file the initial petition. *Cotto*, 2016 IL 119006, ¶ 41; *People v. Richmond*, 188 Ill. 2d 376, 380-81 (1999) (distinguishing between counsel retained at first stage versus retained at second stage). Nonetheless, both appointed and privately-retained postconviction counsel must provide "reasonable assistance." *Cotto*, 2016 IL 119006, ¶ 41.

¶ 52 Under these principles, it should be harder for a defendant to raise and win a "reasonable assistance" claim after postconviction than an "ineffective assistance" claim after trial or direct appeal. And yet, our supreme court seemed to hold otherwise in *People v. Suarez*, 224 Ill. 2d 37 (2007), on which Zareski principally relies. In *Suarez*, counsel was appointed to assist Suarez at the second stage of postconviction proceedings and filed a supplemental petition; however, counsel failed to file a certificate of compliance with Rule 651, and the record did not demonstrate whether counsel complied with that rule. The Illinois Supreme Court held that, because it had not been shown whether counsel had fulfilled the duties of Rule 651, it would remand the case "regardless of whether the claims raised in the petition had merit." *Id.* at 47.

¶ 53 Zareski uses the "regardless of merit" language of *Suarez* to argue that, because Frankel failed to formulate his claims properly in the postconviction petition, Zareski is entitled to remand regardless of whether those claims would have had any chance of success in postconviction. In sum, we may not examine whether Zareski was prejudiced by Frankel's failures.

¶ 54 But this would be an odd outcome. As explained, in the constitutional context, only truly egregious failures allow for a new trial regardless of prejudice. Under all other circumstances (including a direct appeal counsel's failure to argue a claim), a defendant must prove prejudice. As read by Zareski, the *Suarez* rule equates a postconviction counsel's failure to draft or amend the claim to a claim under *United States v. Cronic*, 466 U.S. 648 (1984). The reasonable assistance standard, however, is supposed to be even lower than the *Strickland* standard. How can we reconcile *Suarez*'s holding with the Supreme Court's statements that defendants are entitled to less assistance in postconviction than on direct appeal?

¶ 55 We believe the answer lies in Rule 651. *Suarez* relied on that rule (as did *People v. Schlosser*, 2012 IL App (1st) 092523, another case cited by Zareski). The real key of the *Suarez* holding was not that Suarez's counsel had provided unreasonable assistance, but that Suarez's counsel had violated a supreme court rule. That failure justified remanding "regardless of merit." But *Suarez* does not say that this automatic-remand rule must apply to retained counsel, who are not guided by Rule 651 if retained at the first stage of proceedings. And, given the logic, we believe that the *Suarez* rule applies only to counsel who have been appointed or retained at the second stage to assist a *pro se* petitioner, not to retained counsel who file the first stage petition. If a prisoner retains counsel at the first stage, he or she is entitled to reasonable assistance, but not to the additional protections of Rule 651 and *Suarez*'s holding. (This comports with the State's interest in protecting *pro se* prisoners over prisoners who can afford to retain their own counsel.)

¶ 56    So, even if Frankel should have presented or amended the claims, we will not remand "regardless of merit." But that does not end the analysis.

¶ 57                        What Does "Reasonable Assistance" Mean?

¶ 58    Even without Rule 651, Zareski is entitled to "reasonable assistance," but our precedent does not help us in evaluating whether Frankel, as retained counsel, provided it. Our supreme court has never explicitly stated a standard, as it has for evaluating effective assistance under *Strickland*. So, we asked the parties to submit supplemental briefing on this issue. The State suggests that we should use a *Strickland*-like analysis for these claims by presuming the competence of postconviction counsel and requiring that the petitioner show prejudice. Zareski argues that we should evaluate reasonable assistance in tandem with Rule 651's requirements—but we have already explained that the rule, by its text and interpretations, does not apply to counsel like Frankel who were retained at the first stage.

¶ 59    We find a *Strickland*-like analysis is the appropriate standard to use for reasonable assistance claims as well. It requires an evaluation of prejudice, appropriate to our analysis of *Suarez*. This would prevent pointless remands to trial courts for repeated evaluation of claims that have no chance of success. It is well-established within Illinois criminal law, familiar to both the courts and attorneys. It has been used to evaluate counsel in other Illinois non-criminal proceedings, such as involuntary commitment or parental rights terminations. See *In re Carmody*, 274 Ill. App. 3d 46, 57 (1995). And unlike Rule 651(c), whose text refers only to duties undertaken at the second stage of proceedings, a *Strickland*-like analysis also could be used if a postconviction petitioner alleged that his or her counsel provided unreasonable assistance at the third stage of proceedings (the evidentiary hearing).

¶ 60    A number of states use the *Strickland* standard to evaluate postconviction counsel. See *Silva v. People*, 156 P.3d 1164 (Colo. 2007) (*en banc*); *Iovieno v. Commissioner of Correction*, 699 A.2d 1003, 1011-12 (Conn. 1997); *Stovall v. State*, 800 A.2d 31, 38 (Md. Ct. Spec. App. 2002); *Johnson v. State*, 681 N.W.2d 769, 776-77 (N.D. 2004); *Jackson v. Weber*, 637 N.W.2d 19, 23 (S.D. 2001); *Menzies v. Galetka*, 150 P.3d 480, 511 (Utah 2006). Still more states use a standard bearing a strong resemblance to *Strickland*, without explicitly citing the case. See *Grinols v. State*, 10 P.3d 600, 619-20 (Alaska Ct. App. 2000) (claim that postconviction counsel was ineffective must show incompetence by counsel, that omitted legal issue is meritorious, and reasonable possibility of different outcome at trial); *Whitsel v. State*, 525 N.W.2d 860, 865 (Iowa 1994) (to show ineffectiveness of postconviction counsel, petitioner must show prejudice from counsel's failures); *Robertson v. State*, 201 P.3d 691 (Kan. 2009) (to show incompetence of collateral attack counsel, must show prejudice); *Commonwealth v. Priovolos*, 715 A.2d 420, 422 (Pa. 1998) (to determine whether postconviction counsel was ineffective, must examine merits of underlying claim). (There are also a number of states where postconviction petitioners have no right whatsoever to a particular level of assistance from postconviction counsel. See, *e.g.*, *Murphy v. State*, 327 P.3d 365 (Idaho 2014).) The takeaway from all these jurisdictions is that, in evaluating the performance of postconviction counsel, whether the petitioner was prejudiced (at a minimum) should be part of the inquiry.

¶ 61    Thus, contrary to Zareski's argument, when he argues that Frankel provided unreasonable assistance in failing to present a particular claim (either outright or through ineffective assistance of direct appeal counsel), we will examine not just whether Frankel should have presented or amended the claims, but also whether Frankel's failures caused prejudice. We will

follow *Strickland*'s familiar standard to do so. If we find that the potential claim had no merit, Zareski cannot receive postconviction relief on that claim, regardless of whether Frankel should have presented it earlier, better, or at all.

¶ 62                    Failure to Cross-Examine Crespo

¶ 63    This claim fails for the same reason already discussed—we cannot conceive of how Zareski would have benefited from cross-examining Crespo about his statement that he had seen Nieves with a handgun at some point before the shooting. The existence of the handgun was not in question and did not need to be proven through that statement.

¶ 64              Failure to Move to Suppress Lineup Identifications

¶ 65    Next, Zareski argues that Frankel should have argued in postconviction that he was ineffective on direct appeal for failing to argue that his trial counsel should have moved to suppress the lineup identifications made by Crespo and LaBombard. The trial court rejected this claim on the merits.

¶ 66    Counsel on this appeal has not provided a legal basis that trial counsel could have used for that suppression motion. While trial counsel might have benefited from questioning the witnesses about the lineups before trial, he would not have been allowed to do so unless he could have made some legal argument as to why those lineups were unconstitutional. Further, Zareski simply argues that this claim could have been included in his direct appeal, but does not explain why that claim would have had success. Without that information, we will not say that Frankel provided unreasonable assistance for failing to raise this claim.

¶ 67                Raising Claims Barred by *Res Judicata*

¶ 68    Zareski further claims that Frankel raised several ineffective-assistance claims in the postconviction petition that were barred by *res judicata* because they had already been raised and ruled on during direct appeal. Raising these claims was certainly a pointless exercise by Frankel, but Zareski has not explained how this action causes him prejudice, nor can we think of a reason.

¶ 69            Failure to Raise Freestanding Actual Innocence Claim

¶ 70    Zareski argues that Frankel should have raised a freestanding actual innocence claim based on Marya Mandujano's affidavit (which claimed that she had witnessed the shooting and had seen Nieves firing a gun). Frankel raised an actual innocence claim based on that affidavit, but also argued that trial counsel was ineffective for failing to find and present Mandujano's testimony.

¶ 71    Frankel could not pursue both a claim that Mandujano's affidavit established actual innocence, and that trial counsel was ineffective for failing to find Mandujano. *People v. Hobley*, 182 Ill. 2d 404, 443-44 (1998). Zareski asserts that Frankel should have chosen the actual innocence claim and not raised the ineffective-assistance claim, rendering the actual innocence claim "freestanding" and reviewable in postconviction. To evaluate this choice, we must examine the actual innocence claim itself. To make a substantial showing of actual innocence, Zareski must present "new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial." *People v. Coleman*, 2013 IL 113307, ¶ 96.

¶ 72    Zareski alleges that the trial court held that Mandujano's affidavit was "newly discovered." In fact, the trial court made no holding on whether the affidavit was "new," but rejected it as not material and cumulative. To be "new," the evidence must have been discovered after trial and could not have been discovered earlier through the exercise of due diligence. *Id.* Mandujano was apparently found after trial, but we cannot see how she could not have been discovered earlier through the exercise of due diligence. Mandujano lived in the same apartment building as Nieves, where the shooting took place, but did not answer the door when the police knocked during their canvass. The location of the shooting and the possible witnesses were well-known to the defense team. *Cf. People v. Jones*, 2016 IL App (1st) 123371, ¶ 91 (since petitioner asserted he was not present during shooting, he would not know who was present and could exonerate him). Nor had she made herself "unavailable" to an extent that she could not have been found before trial. *Cf. id.* (exonerating witness made himself unavailable by fleeing to California after witnessing crime, and so was "newly discovered").

¶ 73    The parties disagree as to whether the law requires that the evidence "totally exonerate" Zareski to be "conclusive." Compare *People v. Gonzalez*, 2016 IL App (1st) 141660, ¶ 28 ("probability, not certainty, is the key" and new evidence need not be "completely dispositive" to be likely to change result on retrial), with *People v. Flowers*, 2015 IL App (1st) 113259, ¶ 33 (new evidence must "totally vindicate or exonerate" defendant). We need not decide this question because this evidence is not "conclusive" under either interpretation. Mandujano's testimony would have supported Zareski's proffered trial theory that he fired at Nieves only in self-defense, but this is not the kind of convincing evidence that would have changed the result on retrial.

¶ 74    Consider *Jones*, 2016 IL App (1st) 123371, ¶¶ 102-04. There, Jones made a substantial showing of actual innocence through a plethora of newly discovered evidence—the affidavit of a newly discovered eyewitness, stating that Jones was not present at the crime scene; the affidavit of the murderer, stating that Jones was not involved; the statements of two alibi witnesses that Jones was with them during the crime; and evidence of misconduct by police officers who obtained Jones's confession. *Id.* ¶ 102. In contrast, only one piece of inculpatory evidence was presented at trial: Jones's videotaped confession, which he consistently claimed was coerced and which did not match some of the physical evidence. *Id.* ¶ 104. Jones met the stringent actual innocence standard. Zareski's actual innocence claim falls far short of that which would have to be made. See *People v. Evans*, 2017 IL App (1st) 143268, ¶¶ 29-31 (where defendant admitted that he was present, armed, and firing during shooting, affidavits from two new witnesses that defendant was not present during shooting were not sufficiently "conclusive"). Since we are rejecting the claim on these grounds, we need not address whether the affidavit was "material" and "noncumulative."

¶ 75    The trial court rejected both forms of the Mandujano claim, but Frankel's failure to choose the actual innocence claim did not prejudice Zareski, as he would not have succeeded even if the claim had been freestanding.

¶ 76                    Waiver of a Second Degree Murder Instruction

¶ 77    Next, Zareski claims that trial counsel provided ineffective assistance by failing to advise him of the sentencing ranges for first and second degree murder, leading Zareski to make an unknowing waiver of his right to an instruction on second degree murder. (On appeal, Zareski

does not claim that trial counsel was ineffective for failing to obtain the instruction.) But Zareski's claim fails at the outset as Zareski had no such right to decide whether he wanted the instruction. Without that right, whatever advice he did or did not receive from trial counsel was of no moment.

¶ 78 Included in the rights belonging exclusively to the defendant is the right to decide whether to submit an instruction on a lesser-included offense. *People v. Brocksmith*, 162 Ill. 2d 224, 229 (1994). But, in *People v. Wilmington*, the Illinois Supreme Court concluded that this does not apply to a second degree murder instruction because second degree murder is not a lesser-included offense of first degree murder, but rather a "lesser-mitigated" offense. 2013 IL 112938, ¶ 48. *Wilmington* distinguished first and second degree murder from the principle underlying *Brocksmith*. "While a defendant who tenders a lesser-included offense instruction exposes himself to potential criminal liability, which he otherwise might avoid if neither the trial judge nor the prosecutor seeks the pertinent instruction," that is not so with second degree murder, since a defendant can only be found guilty of second degree murder if all the elements of first degree murder have already been proven. (Internal quotation marks omitted.) *Id.* Defendants who ask for a lesser-included instruction are exposing themselves to additional risk, akin to other risk-taking decisions like whether to take a plea or testify at trial. The decision is a personal one. But for second degree murder, there is no additional risk, and that puts this decision in the much bigger category of strategic choices to be made by the defense attorney. So, it was not Zareski's decision to make, and he did not have a right that needed to be waived.

¶ 79 Zareski attempts to avoid *Wilmington* by arguing that two post-*Wilmington* courts found that a defendant has the personal right to decide whether to tender a second degree murder instruction. While both of these cases rely on *Brocksmith*, neither cites to *Wilmington*. See *People v. Brown*, 2014 IL App (4th) 120887, ¶ 21; *People v. Shamlodhiya*, 2013 IL App (2d) 120065, ¶ 16. Those cases do not address *Wilmington*'s obvious applicability, and we will not follow them.

¶ 80 Since Zareski did not have a personal right to decide whether he wanted a second degree murder instruction, he was not actually "waiving" any right, there was no "unknowing waiver," and his trial counsel did not provide ineffective assistance in advising him on the sentencing ranges (whatever that advice may have been).

¶ 81 Failure to Impeach With Photographs

¶ 82 Finally, Zareski argues that his trial counsel was ineffective for failing to impeach Crespo and LaBombard with social media photographs showing them flashing gang signs. The State rightly argues that this claim is barred by *res judicata*. On direct appeal, Zareski argued that trial counsel was ineffective for failing to question Crespo and LaBombard about their gang affiliations and failing to investigate the photographs. The appellate court denied this claim on the *Strickland* prejudice prong, holding that, even if this evidence had been presented, it would not have created a "reasonable probability" of a different outcome. *Zareski*, 2012 IL App (1st) 102102-U, ¶ 55. Zareski states that the appellate court declined to rule on this claim, but he confuses it with the argument that Crespo's and LaBombard's bias rendered them incredible witnesses. *Id.* ¶ 32. Beyond the *res judicata* implications, Zareski does not explain how trial counsel would have been able to impeach LaBombard with these photographs. Unlike Crespo,

she never testified regarding gang affiliation one way or the other.

¶ 83                  Direct Appeal Counsel Acting as Postconviction Counsel

¶ 84    In rejecting all of Zareski's claims, we emphasize the potential dangers presented when retained counsel represents a defendant on direct appeal and as postconviction counsel. Although not presented in this case, actual conflicts of interest might easily arise in other factual settings that violate a defendant's right to conflict-free counsel. Practitioners are reminded to exercise caution and thoughtful consideration in deciding whether to act as direct appeal counsel and postconviction counsel.

¶ 85    Affirmed.