2022 IL App (2d) 210641-U
No. 2-21-0641
Order filed November 7, 2022

NOTICE: This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of DeKalb County. |
| Respondent-Appellee, | ) ) | |
| v. | ) ) | No. 09 CF 467 |
| MICHAEL R. GREENWELL, | ) ) | Honorable Joseph C. Pederson, |
| Petitioner-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Presiding Justice Brennan and Justice Birkett concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Where postconviction counsel failed to comply with Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013), order dismissing claims after second-stage proceedings would be vacated and cause remanded for compliance with Rule 651(c) regarding these claims; petitioner failed to establish that the trial court erred in denying claims that survived to the third stage of proceedings.

¶ 2                    I. INTRODUCTION

¶ 3   Petitioner, Michael R. Greenwell, appeals a series of orders of the circuit court of DeKalb County denying his postconviction petition (725 ILCS 5/122-1 *et seq.* (West 2018)) after second-

and third-stage proceedings. For the reasons that follow, we vacate in part, affirm in part, and remand with instructions.

¶ 4                                    II. BACKGROUND

¶ 5     Petitioner was arrested on September 6, 2009, and charged with 3 counts of first-degree murder two days later. A count of concealing a homicidal death was added on December 10, 2009. The charges arose out of the death of Brent Petrakovitz. Petitioner asserted that he had acted in self-defense. Following a jury trial in January 2012, petitioner was convicted of first-degree murder and concealing a homicidal death. He was sentenced to 38 years' imprisonment and 5 years' imprisonment, respectively, with sentences running consecutively. We will summarize the evidence adduced at trial.

¶ 6     The State first presented two DeKalb-area residents who testified that they found a burned pickup truck on the morning of September 6, 2009, and notified the police. The truck was found in a wooded area known as "the B." They also noted a dead body next to the truck. Detective Angel Reyes testified that he arrived at the scene, took photographs, and collected evidence. Other officers were already present. They recovered a gas can, a bottle of herbicide, a crowbar, and burned clothes. The State also introduced a recording of a call petitioner made to the police that day in which he reported that the victim had borrowed his truck the night before and had never returned.

¶ 7     Detective Steve Lekkas testified that as a result of petitioner's call, he and Detective Redel went to the home of Walter and Yvette Zick. They encountered petitioner in the front of the house. Redel told petitioner that his truck had been located and it had been burned. They asked petitioner to come to the police station, and he agreed. After they arrived (petitioner was driven to the station by the victim's girlfriend, Amy Kennedy), the police interviewed petitioner. Petitioner told them

that he and the victim had been at a bonfire at the Zicks' house. Between midnight and 1 a.m., Kennedy and Yvette Zick left to get cigarettes. After they left, petitioner related, the victim took petitioner's truck to go and meet a woman at a bar. He never returned. Petitioner later stated that the victim had actually left to purchase cocaine; however, he subsequently related that the victim had intended to rob a drug dealer. Petitioner then speculated that something must have gone wrong with the robbery and that the truck had been burned to destroy evidence.

¶ 8 Redel informed petitioner that a body had been found near the truck. Petitioner said, "Brent's dead?" During the interview, Lekkas noted that hair on the right side of petitioner's forehead and hair on his arm was singed. Lekkas asked petitioner if he killed the victim; petitioner denied doing so. Petitioner never told Lekkas that he had killed the victim in self-defense.

¶ 9 Walter Zick testified that he and the victim were good friends. He knew petitioner through the victim. Amy Kennedy was the victim's girlfriend. Petitioner, the victim, and Kennedy spent Saturday, September 5, 2009, at Zicks' house "partying." Walter's wife, Yvette, was also present. When darkness fell, they started a fire in a firepit. Kennedy and Yvette left to buy cigarettes at about 11 p.m. Walter testified that he went inside to use the bathroom. He heard a "thud." When Walter came back outside, he saw the victim lying on the ground. Petitioner was standing over him holding an ax handle. Walter saw petitioner hit petitioner "once or twice more." He also observed petitioner kick the victim. The victim was unconscious, and Walter could see blood near his head.

¶ 10 Petitioner asked Walter to help him load the victim into petitioner's truck. Walter refused. Petitioner got a piece of carpet out of Walter's garage and used it to drag the victim to the truck. Petitioner loaded the victim into the truck and left just before Kennedy and Yvette returned.

¶ 11    Petitioner returned about an hour later. He was on foot. Walther described him as "sweaty" and shirtless. Petitioner went into the garage. Walter noted his hands were covered in blood. Petitioner asked to clean himself up. Walter gave him a bar of soap and directed him to a garden hose. Walter also gave petitioner some clothes, and petitioner burned the pants he was wearing in the fire pit. Petitioner told Walter that he had hit the victim with a crowbar and that he "did his first murder." Walter acknowledged that he had been charged with concealing a homicidal death and that he was testifying pursuant to a plea deal with the State.

¶ 12    Yvette Zick testified that at about 11:15 p.m. on the night of the victim's death, she and Amy Kennedy went to purchase cigarettes at a gas station. As they returned to her house, petitioner drove past them in a white pickup truck. When they got to the house, Walter was the only person there. He did not tell them what had just transpired. Petitioner returned, on foot, at 12:15 a.m. or 12:30 a.m. He was out of breath, and there was blood on his hand. Petitioner stated that he left the victim and his truck at a downtown bar. He also stated that the blood on his hand was from him hitting a wall. Petitioner cleaned himself up. Yvette and Walter went to bed. In the morning, petitioner and Kennedy were still at their house.

¶ 13    The police came to the house the next day at 10 p.m. Yvette told them nothing unusual had happened the night before, explaining that she was scared. A few hours later, the police asked her to come to the station, and Yvette agreed. At that time, she told them everything that had happened. By the time the police came, Walter had told her that the victim was dead.

¶ 14    The State's next witness was David Darby, who was a friend of the victim and a neighbor of the Zicks. He also knew petitioner, who sometimes stayed at Darby's house. At about 2:30 a.m. on September 6, 2009, Darby was sleeping. Petitioner called and asked to borrow some money for beer and cigarettes. Petitioner came over, and Darby loaned him $50. Petitioner was

not acting unusual at this time. Darby went back to sleep. Petitioner left and returned about 5:30 a.m. Darby awoke but went back to sleep.

¶ 15    Darby testified that he got up about at 9 a.m. the next morning. Petitioner was sleeping on the couch. Darby went to work for three or four hours and returned around 3 p.m. or 3:30 p.m. Petitioner was still there. Petitioner told Darby that the victim had borrowed his truck and not returned it. Petitioner stated that he was going to report this to the police. Petitioner never stated that he had killed the victim or that the victim had attacked him.

¶ 16    The next day, the police came to Darby's house. Darby gave them permission to search his house. Darby accompanied them to the garage, where he noted that a half-full jug of Honcho-brand weed killer was missing.

¶ 17    Detective Angel Reyes testified that he responded to the area where the burned truck and the victim's body had been located on September 6, 2009. He identified, *inter alia*, a plastic herbicide container and a crowbar recovered at the scene. Reyes also participated in a search of the Zicks' house. In the backyard near the firepit, Reyes recovered "a burnt portion of jeans." Other material from the jeans was recovered from the firepit. He also found blood on the ground near the firepit. A DNA sample of the blood matched the victim.

¶ 18    Officer Michael Stewart testified that he and Detective Nachman interrogated petitioner on March 30, 2010. The jury viewed a video recording of a redacted version of the interrogation. We summarize this statement here. Petitioner stated that Kennedy and Yvette left the Zicks' residence to buy cigarettes. The victim acted like he was leaving. Petitioner was standing near the fire, watching it. He heard a noise behind him and turned around. The victim was standing behind him holding an ax handle. Petitioner, attempting to defend himself, grabbed the ax handle. They struggled over it. Petitioner wrested the ax handle from the victim and struck him in the head with

it. Petitioner struck the victim one or two additional times and yelled, "Stay down." Walter came out of the house at this point. Petitioner stated that the victim was dead. Walter told petitioner to get the victim out of his yard before Yvette and Kennedy returned. Petitioner dragged the victim to his truck using a piece of carpet. Walter helped petitioner load the victim into the truck.

¶ 19    Petitioner drove the truck to "the B" and pulled the victim out. He attempted to leave in his truck, but was stuck in the mud, so he ran back to the Zicks' house. When he got there, he cleaned up and changed into some clothes the Zicks gave him. He told Yvette and Kennedy that he had left the victim at a bar.

¶ 20    After the Zicks went to bed, he and Kennedy went to look for the victim in her car. They stopped at Darby's house, and petitioner took a can of gasoline and a bottle of weed killer from Darby's garage. He and Kennedy drove to "the B." They went to where petitioner's truck was located. Kennedy remained in the car. Petitioner poured weed killer and gasoline on the victim and the truck and ignited them. They drove back to the Zicks' house and slept in a tent in the backyard.

¶ 21    Dr. Hilary McElligott, a pathologist with a subspecialty in forensics, testified that she reviewed the autopsy report of the victim, which had been performed by Dr. Bryan Mitchell. The toxicology report showed cocaine and alcohol usage. McElligott opined that the victim suffered "approximately eight separate blows." She further opined that the physical blows suffered by the victim occurred prior to death and that the burns were *postmortem*.

¶ 22    When called on petitioner's behalf, Walter Zick testified that Kennedy was the victim's girlfriend. On the Thursday before the victim's death, petitioner came over to assist Walter work on his car. Kennedy was with petitioner. Kennedy and petitioner "disappear[ed] together." The

victim was looking for them. The victim told Walter that he believed Kennedy and petitioner were having sex.

¶ 23    Darby was recalled to testify for petitioner. He stated that he spoke with Walter on the Monday following the victim's death. Walter told Darby that he helped petitioner "load up the truck."

¶ 24    Yvette Zick was next called by petitioner. She and the victim had a conversation when they were alone by the firepit. The victim was upset because he thought Kennedy and petitioner "were intimate." The victim was crying at the time. The victim said that he would "fuck him up."

¶ 25    Petitioner then called Amy Kennedy. She had a relationship with the victim during the nine months leading up to his death, which she described as "[f]or the most part continuous but a couple of times off." She stated that they had mutually agreed to separate about three days before his death. She had known petitioner for 10 or 11 months at this time. She and the victim drank on a daily basis and also used cocaine and prescription drugs. This could make him happy or put him in a bad mood. About a week before his death, the victim grabbed Kennedy and left bruises on her arms. "A couple weeks" before that, the victim got intoxicated and threatened Kennedy with a crossbow. Petitioner was present. Prior to the victim's death, she had been intimate with petitioner two or three times. Since the victim's death, Kennedy has had no contact with petitioner.

¶ 26    Petitioner next called Sarah Moses, his ex-girlfriend. She testified that they had dated for two years. At the time of the victim's death, Moses described her relationship with petitioner as "strained," "due to the excessive drugs, alcohol and infidelity." On Friday, September 4, 2009, the victim came to her house. They spoke in the front yard; only the two of them were present. The victim told Moses that he was still in a "motorcycle gang and that [petitioner] was going to be in big trouble." The victim left but returned later that evening. He was intoxicated and angry. The

victim again said he was in a motorcycle gang and that petitioner would be in trouble if he was with Kennedy. He also stated "that if [petitioner] was fucking Amy he was going to fucking kill [him]."

¶ 27　Two or three days after the victim's death, Moses, accompanied by petitioner's mother, went to speak with Walter Zick. Walter told her that he had assisted petitioner in putting the victim's body in petitioner's truck. Moses testified that she did not have an ongoing relationship with petitioner.

¶ 28　Jennifer Hetchler was petitioner's final witness. She testified that she had known petitioner for his entire life and that petitioner was like a son to her and the victim. She had dated the victim for 12 or 13 years. She observed the victim under the influence of alcohol and drugs on numerous occasions. Sometimes he would be "joyful," sometimes "angry."

¶ 29　Hetchler answered affirmatively when asked if the victim had ever been physically abusive to her. These incidents occurred when he was either intoxicated or hung over. On April 14, 2000, the victim broke her nose. She also had two black eyes. Hetchler went to stay with her cousin. On April 21, 2000, the victim came to Hetchler's cousin's home. The victim came by, and he and Hetchler spoke through the door, which had been opened. The victim punched her in the face. Hetchler's cousin called the police. On September 18, 2005, after a night of drinking, the victim returned home and again punched Hetchler in the face. She called the police. After this, things improved in terms of physical violence between them. At the time of the victim's death, they were not living together, but they still talked everyday about working things out.

¶ 30　On the night before his death, the victim visited Hetchler. He told her that he thought petitioner and Kennedy were sleeping together. The victim wanted to go to the Zicks' house. Hetchler advised him not to.

¶ 31    Following Hetchler's testimony, the defense presented a certified copy of a conviction of the victim for domestic battery (a misdemeanor) on December 14, 2005.

¶ 32    The jury was given instructions on second-degree murder and self-defense. Petitioner was convicted of first-degree murder and concealment of a homicidal death. He was sentenced to 38-years' imprisonment and 5-years' imprisonment respectively, with the terms to be served consecutively.

¶ 33    On direct appeal, the sole issue raised was whether the concealment charge was timely filed, as it was brought 459 days after the initial complaint. This court found that it and the murder charges did not arise from a series of related acts, so compulsory-joinder principles did not apply. *People v. Greenwell*, 2013 IL App (2d) 120824-U.

¶ 34    Petitioner filed his *pro se* postconviction petition on February 9, 2015. In it, he raised three main claims, the first of which had six subparts. In the first subpart, petitioner alleged ineffective assistance of trial counsel for failing to object to the introduction of a redacted version of his interrogation and an allegedly inaccurate transcript of that interrogation. Second, petitioner asserted trial counsel's ineffectiveness for not reviewing medical evidence or obtaining an expert to review the victim's autopsy because there allegedly were other explanations for the victim's injuries. He also argued that counsels should have argued that he did not set the victim's body on fire and that it burned simply because it was next to the truck. Third, petitioner argued that trial counsel was ineffective for not seeking DNA testing of the crowbar. Fourth, petitioner asserted that trial counsel was ineffective for not objecting to prosecutorial misconduct during closing argument (particularly, throwing the crowbar to the ground in front of the jury and at petitioner's feet). Fifth, he alleged ineffective assistance of trial counsel for improperly advising him of the consequences of declining the State's plea offer by telling him he would receive only 20 years.

Sixth, he alleged that appellate counsel was ineffective for failing to properly preserve the previous five issues.

¶ 35    Petitioner's second claim asserted prosecutorial misconduct for throwing the crowbar to the floor and misstating the evidence during closing argument.    The third claim was that petitioner's convictions were void because the record did not show that the grand jury that issued the indictment was sworn.

¶ 36    The petition was advanced to the second stage of postconviction proceedings, and counsel was appointed.  Counsel did not amend any of claimant's *pro se* claims but added nine new claims. While postconviction counsel is free to amend a petitioner's petition and add new claims, counsel is under no obligation to do so.  *People v. Pendleton*, 223 Ill. 2d 458, 475-76 (2006).  Counsel's obligation is limited to "adequately present[ing] and support[ing] those constitutional claims raised by the petitioner."  *People v. Davis*, 156 Ill. 2d 149, 164 (1993).  As such, counsel's performance with respect to these additional claims would provide no basis for granting petitioner relief in this appeal, assuming, *arguendo*, that it was deficient in some way.  Hence, we need not discuss them further.

¶ 37    The State moved to dismiss.  Postconviction counsel filed a certificate in accordance with Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013).  The trial court granted the State's motion in part.  On December 5, 2017, the trial court issued an oral ruling.  It denied the State's motion as to the sixth subpart of the first claim in petitioner's *pro se* postconviction petition pertaining to appellate counsel failing to preserve the other issues raised in the first claim.  It also denied the State's motion regarding petitioner's *pro se* second claim alleging prosecutorial misconduct.  It granted the motion to dismiss regarding all subparts of petitioner's first *pro se* claim other than the one involving ineffective assistance of appellate counsel.  It also dismissed petitioner's third *pro*

*se* claim concerning the grand jury not being sworn. The trial court did not articulate the bases for its rulings at this point.

¶ 38 On January 30, 2018, the court entered a second order concerning the State's motion. Regarding the five sub-parts of the first claim which were dismissed earlier, the trial court explained, "What is lacking from the petition is an argument or theory as to how these failures individually would probably have changed the outcome of the trial." It also found that they could have been raised on direct appeal and were therefore forfeited. It noted that claims involving the ineffective assistance of appellate counsel lie outside the forfeiture doctrine. Accordingly, it again advanced the sixth subpart of petitioner's first claim. At this juncture, the trial court also dismissed the second claim advanced by petitioner in his *pro se* petition based on prosecutorial misconduct, specifically finding that "[t]he alleged actions of the prosecutor during his closing arguments are not reflected in the record." It further found that petitioner's third claim—that the grand jury that indicted him was not sworn—was directly contradicted by the record.

¶ 39 The State moved for reconsideration; it also filed an answer to petitioner's remaining claim (stating that it was not waiving its motion for reconsideration). Subsequently, the trial court denied the State's motion to reconsider, and the case then proceeded to an evidentiary hearing on the remaining claim.

¶ 40 The sole witness to testify at the evidentiary hearing was Jamie Montgomery of the Office of the State Appellate Defender. Montgomery stated that generally begins working on an appeal by reading the entire record. After she received the petitioner's file, she communicated with him by letter and through at least one telephone call. She did not visit petitioner in prison. The direct appeal that she filed raised a single issue—whether petitioner's speedy-trial rights were violated in light of compulsory-joinder principles. She discussed other issues with petitioner prior to filing

the direct appeal. These included the length of petitioner's sentence, reasonable doubt, and issues concerning the transcript and video recording of petitioner's statement. They also discussed prosecutorial misconduct during closing argument (the State yelling and throwing a crowbar). She did not specifically recall discussing with petitioner whether trial counsel advised petitioner properly regarding a plea agreement.

¶ 41 Montgomery recalled that as she reviewed the record of the proceedings in the trial court, she noted that one of petitioner's trial attorneys filed a posttrial motion alleging her own ineffectiveness. She did not recall whether she discussed this with petitioner, but she did call the attorney.

¶ 42 Petitioner sent letters to Montgomery suggesting other issues, but she felt none of them had merit. One such issue was that trial counsel purportedly did not review a redacted video of petitioner's statement prior to trial. Montgomery noted that issue was not properly preserved. She agreed that the trial judge expressed concern about a transcript of the statement not being accurate (some portions the transcriber stated were inaudible were, in fact, audible). Montgomery stated she was "not aware of the transcript being shown to the jury." The trial judge offered the jurors an opportunity to watch the video a second time, but they declined.

¶ 43 Montgomery further explained that the redacted video contained other-crimes evidence. Montgomery stated that she had to request the transcript from the public defender's office, so it was not a part of the record. At this point, the trial judge questioned how she could assess the impact of the transcript on the jury if it was not in the record. Montgomery testified that had there been an issue of merit that could have been raised regarding the transcript, she would have moved to supplement the record with it. She noted that the jury had been instructed that the video was the actual evidence in this case.

¶ 44    Montgomery stated that she recalled discussing DNA testing with petitioner. Petitioner was concerned that the crowbar had not been tested, but this issue was not raised in petitioner's posttrial motion. Further, the crowbar had been presented during closing argument. Petitioner's trial counsel did not object when the prosecutor threw the crowbar during his closing. In the posttrial motion, trial counsel raised her own ineffectiveness for failing to object when the prosecutor threw the crowbar at petitioner's feet and at the edge of the jury box.

¶ 45    Montgomery did not recall discussing with petitioner the advice he received from his trial attorney regarding a plea agreement. She noted that such conversations are usually not of record, so they cannot typically be raised during the direct appeal.

¶ 46    On cross-examination, Montgomery agreed that petitioner had asked her to raise some issues that she did not raise. Her opinion was that they would not have been meritorious. Petitioner suggested a speedy-trial claim relative to the murder charge (this was distinct from the claim raised on direct appeal concerning the concealment charge), but "the majority of the continuances were either agreed or were on defense motion."

¶ 47    Montgomery explained that she did not raise any issue regarding the transcript because she could not show petitioner suffered any prejudice, as the jury did not receive the transcript during deliberations and had been instructed that it was not evidence and that the video was evidence. Regarding other-crimes evidence on the video, Montgomery acknowledged its presence; however, she noted that petitioner needed it to be admitted to substantiate his self-defense claim. As such, she regarded this as part of trial counsel's strategy.

¶ 48    She did not believe petitioner could successfully challenge the length of his sentence, noting that this is typically a matter for the trial court's discretion. Moreover, she opined that the sentence petitioner receive was "fairly light," particularly in light of the fact that the trial court

found that the offense was accompanied by "exceptionally brutal and heinous" conduct. She also opined that a reasonable-doubt argument would not have been viable given the state of the record.

¶ 49 Regarding DNA testing of the crowbar, Montgomery agreed that the fact that it was recovered from the burnt area next to the truck would have degraded any DNA samples. Moreover, neither petitioner nor any of his attorneys identified anyone who held a contrary opinion. The same was true of the opinions of McElligott.

¶ 50 As for the crowbar incident during closing argument, Montgomery again opined that she could not prove prejudice. She explained that she would have to have shown that it "was basically the deciding factor for why the jury convicted" petitioner. Thus, "while erroneous[,] it was harmless."

¶ 51 The trial court dismissed the remaining claims in petitioner's postconviction petition that had survived until the third stage of postconviction proceedings on June 12, 2019, announcing its reasoning in open court. After reviewing petitioner's claims, the trial court largely credited Montgomery's testimony and opinions. Of particular relevance here are the following findings. First, the trial court noted that while the "ineffectiveness issues raised in the post-trial motions do support a claim of error, [in Montgomery's opinion,] it would have been found harmless as were [*sic*] the actions of the prosecutor during his closing argument." The trial court also stated:

"Additionally although it was suggested that there were errors and omissions in the transcript used at trial, it was not and is not part of the record which prevents this Court from knowing the level of egregiousness of those defects."

It concluded by acknowledging that "the trial like all trials had flaws but not to the extent that would support the granting of a new trial." It therefore denied petitioner's petition. This appeal followed.

¶ 52                                    III. ANALYSIS

¶ 53    Petitioner asserts that postconviction counsel failed to comply with Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013), which imposes *inter alia*, a duty to make "any amendments to the filed *pro se* petitions necessary to adequately present the petitioner's contentions." *People v. Profit*, 2012 IL App (1st) 101307, ¶ 18. Petitioner contends that his attorney failed to amend his postconviction petition to adequately present his claims.

¶ 54    The trial court resolved petitioner's claims following second- and third-stage postconviction proceedings. Under the Act, a petitioner may challenge his or her conviction by alleging a constitutional violation. *People v. Domagala*, 2013 IL 113688, ¶ 32. The Act sets forth a three-stage process of review. This cause proceeded beyond the first stage. In both the second stage and the third stage, the petitioner bears the burden of "making a substantial showing of a constitutional violation." *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006) (citing *People v. Coleman*, 206 Ill. 2d 261, 277 (2002)). If the petition survives to the second stage, an attorney may be appointed to assist the petitioner. *Id.* at 472. "At the second stage of proceedings, all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true, and, in the event the circuit court dismisses the petition at that stage, we generally review the circuit court's decision using a *de novo* standard." *Id.* at 473. If any claims survive to the third stage, an evidentiary hearing is held. *Id.* If the trial court's decision involves fact-finding or credibility determinations, we will not disturb it unless it is manifestly erroneous. *Id*. If no such determinations are involved, the *de novo* standard applies "unless the judge presiding over postconviction proceedings has some 'special expertise or familiarity' with the trial or sentencing of the [petitioner] and that 'familiarity' has some bearing upon disposition of the postconviction petition." *Id*.

¶ 55    Generally, a petitioner is entitled to a "reasonable level of assistance" during postconviction proceedings. *People v. Turner*, 187 Ill. 2d 406, 410 (1999).  To this end, Illinois Supreme Court Rule 651(c) sets forth the specific duties counsel must perform during second-stage proceedings.  *Id.*  This rule does not apply to third-stage proceedings; rather, at that stage, the standard is one of general reasonableness.  *People v. Pabello*, 2019 IL App (2d) 170867, ¶ 29. Rule 651(c) requires that counsel consult with the petitioner, examine the record, and amend the petitioner's *pro se* petition to adequately present the petitioner's claims.  *People v. Marshall*, 375 Ill. App. 3d 670, 680 (2007); Ill. S. Ct. R. 651(c) (eff. Feb. 6, 2013).  This rule also requires counsel to file an affidavit certifying that he or she has fulfilled those duties.  *Schlosser*, 2012 IL App (1st) 092523, ¶ 18.  The filing of such an affidavit creates a rebuttable presumption that postconviction counsel provided reasonable assistance.  *Profit*, 2012 IL App (1st) 101307, ¶ 19.  The burden is on a petitioner to overcome this presumption.  *Id.*  Failing to do so forecloses further review of the reasonableness of postconviction counsel's conduct.  *People v. Mendoza*, 402 Ill. App. 3d 808, 813 (2010) (citing *People v. Rossi*, 387 Ill. App. 3d 1054, 1060 (2009)).

¶ 56    Furthermore, counsel's failure to comply with Rule 651(c) may not be excused on the basis that it is harmless.  *People v. Suarez*, 224 Ill. 2d 37, 51-52 (2007).  Our supreme court has held that "it is error to dismiss a postconviction petition on the pleadings where there has been inadequate representation by counsel." *Id* at 47.  It further noted, "This court has consistently held that remand is required where postconviction counsel failed to fulfill the duties of consultation, examining the record, and amendment of the *pro se* petition, regardless of whether the claims raised in the petition had merit." *Id.*  It further explained, "Our Rule 651(c) analysis has been driven, not by whether a particular defendant's claim is potentially meritorious, but by the conviction that where postconviction counsel does not adequately complete the duties mandated

by the rule, the limited right to counsel conferred by the Act cannot be fully realized." *Id.* at 51. Whether the underlying issue is meritorious is immaterial. *Id.* Accordingly, a reviewing court should "not speculate whether the trial court would have dismissed the petition without an evidentiary hearing if counsel had adequately performed his duties under Rule 651(c)." *People v. Turner*, 187 Ill. 2d 406, 416 (1999). Nevertheless, the rule does not require counsel "to advance frivolous or spurious claims." *People v. Greer*, 212 Ill. 2d 192, 205 (2004). In any event, if counsel fails to comply with Rule 651(c), a petitioner need not show that the omission was prejudicial. *People v. Nitz*, 2011 IL App (2d) 100031, ¶ 18 (citing *People v. Perkins*, 367 Ill. App. 3d 895, 905 (2006)).

¶ 57 We emphasize, however, that the case law set forth in the preceding paragraph stating that the failure to comply with Rule 651(c) need not be prejudicial for a petitioner to obtain relief does not mean that counsel's failure to make any amendment, no matter how insignificant, is enough to establish a violation of the rule. Initially, we note that Rule 651(c) contains a limitation on postconviction counsel's obligations to amend or supplement a petition—counsel must only make "any amendments to the petitions filed *pro se* that are *necessary for an adequate presentation* of petitioner's contentions." (Emphasis added.) Ill. S. Ct. R. 651(c) (eff. Feb. 6, 2013). Moreover, the Postconviction Hearing Act (725 ILCS 5/122-1 et seq. (West 2018)) guarantees a petitioner a right to the "reasonable" assistance of counsel. *People v. Hardin*, 217 Ill. 2d 289, 299 (2005). Thus, though a petitioner need not show that, but for an omission by counsel, a different result would have likely followed, he or she must nevertheless show that a reasonable attorney would have made whatever amendment postconviction counsel failed to make. See *Turner*, 187 Ill. 2d at 414 ("Given the totality of circumstances in this case, we hold that post-conviction counsel's performance was unreasonable and fell below the level of assistance required by Rule 651(c).");

*People v. Kluppelberg*, 327 Ill. App. 3d 939, 947 (2002) ("Therefore, our analysis leads us to find that post-conviction counsel's failure to assert appellate counsel's ineffectiveness, especially where it was properly alleged in the *pro se* petition, was patently unreasonable."). Hence, the reasonableness standard remains part of the inquiry during second-stage proceedings.

¶ 58    Before turning to petitioner's particular claims, we acknowledge the State's argument that because some claims were resolved during third-stage proceedings, Rule 651(c) does not apply. It is true, as the State points out, that Rule 651(c) does not govern counsel's conduct during third-stage proceedings. *Pabello*, 2019 IL App (2d) 170867, ¶ 29. However, several of petitioner's claims were dismissed during the second stage, so the rule applies to them. *People v. Zareski*, 2017 IL App (1st) 150836, ¶ 59.

¶ 59    In a somewhat related contention, the State asserts that the trial court, despite dismissing petitioner's five claims alleging ineffective assistance of trial counsel, actually advanced them, *de facto*, when it advanced petitioner's claim that appellate counsel was ineffective for failing to preserve them. The State contends that the "practical effect" of this order was that the underlying ineffectiveness claims rode along with the claim directed to appellate counsel's ineffectiveness. We find this claim unpersuasive. As appellate counsel testified during third-stage proceedings, she could not have raised a number of these claims on appeal because they relied on matters outside the record. Any question of appellate counsel's effectiveness was foreclosed by the fact that the evidence necessary to raise these claims was not available to her. Conversely, during a collateral, postconviction proceeding, postconviction counsel could have supplemented the record and raised these issues. That is, claims pertaining to appellate counsel's performance were limited to the record as it existed during petitioner's direct appeal; the same is not true of claims raised in this

proceeding, because counsel had the opportunity to supplement the record and could have mounted a direct challenge to the underlying issues. These two types of claims are distinct from each other.

¶ 60    Petitioner raises three main complaints regarding postconviction counsel's performance. First, he asserts that postconviction counsel should have amended and supported his claim regarding prosecutorial misconduct during closing argument. Second, he points to counsel's failure to amend or support his *pro se* claim that trial court was ineffective for failing to object to the introduction of the redacted video of his statement to the police. Third, he argues that counsel should have supplemented his claim that his trial attorney was ineffective in providing advice concerning a plea offer from the State. We will address these contentions in turn.

¶ 61    Petitioner first contends that postconviction counsel should have supported his *pro se* claim that the prosecutor engaged in misconduct by throwing a crowbar to the ground before the jury and at his feet during closing argument. Relatedly, petitioner asserts that his trial attorney was ineffective for failing to object to this conduct. Petitioner notes that trial counsel alleged her own ineffectiveness based on her failure to object to this conduct, lending credence to the assertion that it occurred, despite it not being mentioned in the transcript of closing arguments. We note that petitioner supported his *pro se* petition with an affidavit, in which he averred:

> "On January 31st 2012, I asked my attorney (Regina Harris) why she didn't object or put something on record when State's Attorney Mr. Montgomery was yelling and screaming and acting-out all the 'chopping' motions with the crowbar and then he 'threw' the crowbar across the courtroom at the jury box 'startling' them, and then he picked the crowbar up and threw it back across the courtroom to land at my feet and [the] escort officers [*sic*] feet—Ms. Harris told me she didn't object because she was in 'shock' that [the prosecutor] was doing this and Judge Stuckert was allowing it."

¶ 62    Regarding these claims (the prosecutor's alleged misconduct and trial counsel's failure to object to it), petitioner now argues that the record "gives no hint of the prosecutor's cheap theatrics—throwing the crowbar toward the jury box or at [petitioner's] feet, or looming over [petitioner] and shouting questions at him." This is not literally true, as petitioner's affidavit covers some of these events. However, it is counsel's obligation to shape a petitioner's *pro se* claims into proper legal form. *People v. Richardson*, 382 Ill. App. 3d 248, 253 (2008). A petitioner must meet a high standard to succeed on an allegation of prosecutorial misconduct during closing argument. See *People v Kitchen*, 159 Ill. 2d 1, 38 (1994) (holding that only improper remarks that result in *substantial* prejudice to a defendant warrant disturbing a conviction). Thus, a reasonable attorney would have fleshed out petitioner's affidavit to include details like the prosecutor "looming over [petitioner] and shouting questions at him." Further, a reasonable attorney would have attempted to procure an affidavit from defense counsel to substantiate these claims. See *People v. Mendoza*, 402 Ill. App. 3d 808, 816 (2010). Indeed, we note that the *very* reason that the trial court dismissed petitioner's claim alleging prosecutorial misconduct was lack of factual support:

"On the [petitioner's] claims two and three the record does not support moving either of these claims to stage three. The alleged actions of the prosecutor during his closing arguments are not reflected in the record and, thus, there is no factual basis to adjudicate the purported violations of constitutional rights."

¶ 63    Petitioner also complains of postconviction counsel's failure to amend and support his *pro se* claim that counsel was ineffective for not objecting to the admission of the redacted video recording of his statement (petitioner clarifies that his argument does not implicate the purportedly inaccurate transcript of his statement, as it was not provided to the jury during deliberations).

Petitioner first points out that there is no indication in the redacted video that he waived his right to be silent or to counsel. However, it is axiomatic that postconviction counsel need not "actively search for sources outside the record that might support general claims raised in a post-conviction petition." *People v. Johnson*, 154 Ill. 2d 227, 247 (1993). Thus, to prevail on this point, it was petitioner's obligation to identify something specific that postconviction counsel should have raised indicating that he did not waive these rights.

¶ 64 Petitioner also asserts that postconviction counsel should have supplemented his *pro se* petition regarding any potential strategy trial counsel had for choosing not to object to the admission of the redacted video. Petitioner notes that before the trial court, the possibility was discussed that counsel did not object to the video to allow the admission of evidence that supported a self-defense theory, particularly in light of the fact that petitioner did not testify. The video also contained an admission by petitioner to the offense of concealment of a homicidal death. Petitioner now points out that trial counsel's "decision-making process and strategy—if any—do not appear in the record." However, trial counsel's performance is assessed using an objective standard. See *People v. Talbert*, 2018 IL App (1st) 160157, ¶ 49 ("To establish that counsel's performance was deficient, a defendant must demonstrate that his performance was objectively unreasonable under prevailing professional standards."). Thus, trial counsel's subjective intentions are immaterial.

¶ 65 Petitioner calls our attention to his unrebutted *pro se* allegation that he did not testify due to a " 'threat' of harm to his mother by the victims [*sic*] family." This would arguably relate to trial counsel's purported decision to present evidence of self-defense through the video. Moreover, it appears in the record, is mentioned in petitioner *pro se* petition, and is thus the sort of issue reasonable counsel would at least investigate. See *Johnson*, 154 Ill. 2d at 242-43.

¶ 66   Finally, petitioner complains that his trial attorney provided him with erroneous advice regarding the sentence he was facing.  In his *pro se* petition, petitioner asserted that the State offered him a 15-year sentence if he agreed to testify against Walter Zick.  Petitioner stated that he asked trial counsel what he would receive if he refused to testify and counsel told him 20 years' imprisonment.  He further stated that he did not believe the 5-year difference was significant enough to testify against Walter, but, had he known the true range was actually triple the State's offer, he would have accepted it.  These claims were supported by a *pro se* affidavit submitted along with the petition.

¶ 67   Petitioner now argues that postconviction counsel should have shaped this into a viable claim.  He notes that there are elements to such claims beyond what he alleged, and he asserts that his attorney should have supplemented this claim to satisfy those elements.  The failure to properly advise a client regarding the sentence he or she is facing does indeed fall below a reasonable level of competence.  *People v. Richardson*, 2011 IL App (3d) 180010, ¶ 17.  To show prejudice, a petitioner must show the following:

> "(1) but for his counsel's deficient advice, he would have accepted the plea offer, (2) the plea would have been entered without the prosecution cancelling it, (3) the trial court would have accepted the bargain, assuming that it had discretion under state law to accept or reject it, and (4) ' "the end result of the criminal process would have been more favorable by reason of a plea." ' " *Richardson*, 2011 IL App (3d) 180010, ¶ 19 (quoting *People v. Hale*, 2013 IL 113140, ¶ 19 (quoting *Missouri v. Frye*, 566 U.S. 134, 147 (2012))).

Petitioner's allegations and averments do not address the latter three elements.  Postconviction counsel should have done so. See *Nicholson*, 2021 IL App (3d) 180010, ¶ 22.  As the State concedes in its answer brief, this point of error was "not completely rebutted by the record or by

the testimony of appellate counsel" because "the allegations [petitioner] raised in his *pro se* post-conviction petition related to maters [*sic*] outside the record."

¶ 68 We also note that, as the State points out, to show that he would not have accepted a plea offer and was thus prejudiced by counsel's erroneous advice, petitioner needed to present more than his "own ' "subjective, self-serving" ' testimony." *People v. Walker*, 2018 IL App (1st) 160509, ¶ 36 (quoting *Hale*, 2013 IL 113140, ¶ 18). By not amending and supporting this claim, postconviction counsel let it rest on nothing but petitioner's own, purportedly self-serving, testimony.

¶ 69 Further, we note that petitioner raises some questions about the conduct of third-stage proceedings. He asserts that postconviction counsel's failure to comply with Rule 651(c) during second-stage proceedings "guaranteed *** [the] denial of relief at the third stage." Petitioner's point is not well taken. Initially, we emphasize that Rule 651(c) does not apply during third-stage proceedings. *Pabello*, 2019 IL App (2d) 170867, ¶ 29. Hence, once a claim survives a motion to dismiss in the second stage and advances to the third stage, Rule 651(c) is no longer relevant. Postconviction counsel was free to put on whatever relevant evidence he could muster regardless of what transpired in the second stage. We note that petitioner neither argues that the trial court's decision regarding the claims that made it to the third stage was manifestly erroneous (see *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 152) nor does he attempt to argue that postconviction counsel's representation was less than reasonable in the third stage (see *Pabello*, 2019 IL App (2d) 170867, ¶ 35). He simply argues that counsel's performance during the second stage affected the proceedings at the third stage; however, it is unclear to us how this could be the case, as counsel was free to put on evidence regarding the claims that did survive.

¶ 70     Regarding the claims that did advance to the third stage (ineffective assistance of appellate counsel), petitioner acknowledges that postconviction counsel did introduce the testimony of his appellate attorney.  However, he now asserts that postconviction counsel should have also called his trial attorney to testify.  He states that had counsel done so, issues dismissed during the second stage due to their reliance on matters outside the record "could have been explored."  Perhaps so, however, these matters remain outside the record.  Accordingly, petitioner's attempt to argue that it was error to not explore them is mere speculation.  We will not disturb a judgment upon pure speculation.  *People v. Runge*, 234 Ill. 2d 68, 138 (2009).

¶ 71     The State attempts to undermine the proposition announced by our supreme court in *Suarez*, 224 Ill. 2d at 51-52, that a petitioner need not prove that an underlying claim was meritorious where postconviction counsel has failed to comply with Rule 651(c).  The State relies on *People v. Zareski*, 2017 IL App (1st) 150836, ¶¶ 52-55; that case is distinguishable.  It is true that the *Zareski* court limited the scope of Rule 651(c); however, the manner in which it did so renders *Zareski* of no relevance to the instant case.  It held:

"But *Suarez* does not say that this automatic-remand rule must apply to retained counsel, who are not guided by Rule 651 if retained at the first stage of proceedings.  And, given the logic, we believe that the *Suarez* rule applies only to counsel who have been appointed or retained at the second stage to assist a *pro se* petitioner, not to retained counsel who file the first stage petition.  If a prisoner retains counsel at the first stage, he or she is entitled to reasonable assistance, but not to the additional protections of Rule 651 and *Suarez's* holding." *Id.* ¶ 55.

Thus, the rule set forth in *Zareski* applies when counsel is retained during first-stage proceedings. The *Zareski* court expressly stated that it did not apply to second-stage proceedings, where *Suarez*

controls. The State's reliance on *Zareski* is misplaced, as is its attempt to interject *Strickland v. Washington*, 466 U.S. 668 (1984), into the analysis.

¶ 72    Accordingly, as explain above, we hold that postconviction counsel failed to comply with Rule 651(c) on three claims. The remedy for such an omission is to remand the case so that petitioner can replead his postconviction petition with the assistance of new counsel.

¶ 73                                IV. CONCLUSION

¶ 74    In light of the foregoing, we vacate the trial court's order dismissing petitioner's *pro se* claims during second-stage proceedings. We remand so that petitioner can replead his postconviction petition. On remand, the trial court shall appoint new counsel to assist petitioner. The trial court's order rejecting petitioner's claims that survived to the third stage of proceedings is affirmed.

¶ 75    Vacated in part and affirmed in part; cause remanded with directions.