2023 IL App (1st) 211587-U

FIRST DIVISION
September 11, 2023

No. 1-21-1587

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Respondent-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 07 CR 14511 01 |
| ERIKA RAY, | ) | |
| | ) | Honorable |
| Petitioner-Appellant. | ) | Charles P. Burns, |
| | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Pucinski and Coghlan concur in the judgment.

**O R D E R**

¶ 1   *Held*: In the interests of justice, this matter is remanded to the circuit court for an evidentiary hearing on the issue of the State's Attorney's alleged knowing subornation of perjury during the petitioner's original trial.

¶ 2   The petitioner, Erika Ray, appeals from the third-stage dismissal of her postconviction petition filed pursuant to the Postconviction Hearing Act (725 ILCS 5/122-1 *et seq*. (West 2006)). On appeal, she solely contends that she was provided unreasonable assistance of postconviction

counsel during the third-stage evidentiary hearing. She asserts that counsel was unreasonable because he failed to investigate and to discover publicly available, outcome determinative impeachment evidence demonstrating that the lead State's attorney at her trial, perjured herself during the evidentiary hearing when she stated that she had never put on perjured testimony in the past. For the following reasons, we reverse and remand, with instructions.

¶ 3                                    I. BACKGROUND

¶ 4    This appeal arises from an incident that occurred over 17 years ago, during which the victim, Corey Ebenezer, was shot and killed in the back of Leona's restaurant in Hyde Park. In 2007, together with codefendants Lorenzo Wilson and Paris Gosha, the petitioner was charged with first degree murder and armed robbery for her involvement in the shooting. The first-degree murder charges included intentional, knowing, and felony murder. 720 ILCS 5/9-1(a)(1), (a)(2), (a)(3) (West 2006). Prior to trial, codefendant Gosha entered into an agreement with the State. He agreed to testify against Wilson and the petitioner in exchange for a guilty plea solely on the armed robbery charge and a sentence of 30-years in prison (to be served at 50%). The petitioner and Wilson were subsequently tried in separate but simultaneous jury trials.

¶ 5    Because the evidence adduced at the petitioner's trial is described in great detail in our order affirming the petitioner's conviction on direct appeal (see *People v. Ray*, 2012 IL App (1st) 102170-U), for purposes of brevity, we now set forth only those facts necessary for the resolution of this appeal.

¶ 6    On June 14, 2006, the petitioner, who was a single mother and part-time student at Roosevelt University, was working as a server at Leona's restaurant in Hyde Park. The victim was her assistant manager. On the evening in question, the petitioner and the victim got into a dispute about whether the petitioner could serve a large group of patrons alone. The dispute ultimately

resulted in the petitioner being fired.

¶ 7     Later that evening, while picking up her daughter from her mother's house, the petitioner ran into her cousin, the codefendant Gosha, and told him what had happened. Gosha asked her whether she wanted him to beat up the victim and the petitioner answered "yes." Gosha subsequently returned with his younger brother[1] and two friends, including the codefendant Wilson,[2] after which the petitioner drove all of them to Leona's.

¶ 8     The petitioner remained in the car while the men entered Leona's. Unbeknownst to her, Wilson had a gun, and during the scuffle that occurred when he and Gosha confronted the victim inside the restaurant, Wilson shot the victim twice, killing him. At trial, Gosha testified that before the scuffle, Wilson pointed the gun at the victim while Gosha "grabbed some money" from the cash register. Gosha admitted that he was the only one who took any money from the register and stated that it was "100 something dollars."

¶ 9     The brawl between Gosha, Wilson and the victim was observed by one of the restaurant's kitchen workers, Lucio Mastache. While working in the kitchen around midnight, Mastache heard a noise from the back of the restaurant, and proceeded to check it out whereupon he observed three black men striking the victim near the restaurant's back door, before hearing gunshots. Upon witnessing this scene, Mastache went to the front of the restaurant to get help from the restaurant manager, Justin Twine.

¶ 10    Mastache and Twine subsequently returned to the back of the restaurant where they found the victim with a gunshot wound, lying between computers near an open cash register drawer on the floor.

---

[1] Gosha's brother, Demetrius Gosha, was never charged with any crime for his involvement in the death of the victim.

[2] Gosha's other friend, Anthony Macon, was also not charged with any crimes for his involvement in the crime. Instead, like Gosha, he testified on behalf of the State at the petitioner's and Wilson's trials.

¶ 11     While the victim was mostly incoherent and coming in and out of consciousness, Twine, who admitted that he was on probation for felony theft, claimed that the victim's last words to him were "I just got ganked," which he interpreted to mean "just got robbed." Mastache did not corroborate Twine's testimony about what the victim said, or about seeing any money at the location where the victim was found. Instead, he averred that at the time of the incident the "cash" had already been taken "upstairs."

¶ 12     At trial, the petitioner denied telling any of the men who entered the restaurant to shoot or rob the victim.[3] She also denied taking any money from the robbery and testified that she did not know that any money was taken from Leona's until she was arrested.

¶ 13     The petitioner further testified that after hearing gunshots from inside the restaurant, she saw Gosha and his friends running out of Leona's. Gosha then banged on her car trunk screaming at her to open it, while the others jumped inside, yelling at her to "drive." She drove the men to the corner of 53rd Street and Morgan, where they jumped out. No one spoke about what happened during the ride. The petitioner stated that she first learned that the victim was dead later that evening.

¶ 14     During closing arguments, the State maintained that the petitioner was the "mastermind" behind the crime and that in her thirst for revenge, she took Gosha and his friends to Leona's with the specific intent to commit armed robbery, which ultimately resulted in the victim's death.

¶ 15     The jury was instructed on intentional, knowing, and felony murder, as well as on accountability principles. After deliberations, it found the petitioner guilty of first-degree murder and armed robbery. The general jury verdict form did not specify under which theory of murder

_____

[3] Macon, who was one of the men who entered the restaurant with Gosha and Wilson, confirmed the petitioner's testimony in this respect.

the petitioner was convicted.

¶ 16    Despite no prior criminal history, the petitioner was subsequently sentenced by the circuit court to concurrent terms of 42 years' imprisonment for murder and 20 years' imprisonment for armed robbery. The circuit court explained its sentencing decision by the fact that the petitioner was the "mastermind" who set in motion the events leading to the armed robbery and the victim's death. We affirmed the petitioner's conviction and sentence on direct appeal. See *Ray*, 2012 IL App (1st) 102170-U, *leave to appeal denied*, 2012 IL 114086.

¶ 17    On August 14, 2012, the petitioner filed an eleven-count *pro se* petition for postconviction relief. After 90 days the petition was automatically advanced to the second stage of postconviction proceedings and counsel was appointed to represent the petitioner. For the next five years, the petition lingered in the circuit court with no substantive filings because two of the assistant public defenders appointed to represent the petitioner retired.

¶ 18    On July 6, 2017, the court appointed present postconviction counsel. After completing discovery, on May 30, 2019, postconviction counsel filed a five-count amended petition, as well as an amended Rule 651(c) certificate (Ill. S. Ct. R. 651(c) (eff. July 1, 2017). Relevant to this appeal, the amended petition alleged, *inter alia*: (1) that the petitioner was actually innocent of armed robbery based on newly discovered evidence, *i.e.*, an affidavit from Paris Gosha, recanting his trial testimony regarding taking money from Leona's; (2) that the State committed a violation pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) because it was aware of Gosha's recantation prior to trial but failed to tender this information to the defense; and (3) that trial counsel was ineffective for rejecting the State's plea offer on the petitioner's behalf without first informing her of the offer.

¶ 19    All three claims were advanced to the third stage for an evidentiary hearing. At that

hearing held on August 3, 2021, the parties presented numerous witnesses and exhibits. Again, for purposes of brevity, we set forth only that evidence relevant to the resolution of the issue raised by the petitioner in this appeal.

¶ 20    The petitioner's cousin, Gosha, first testified that contrary to his trial testimony and his prior statements to police, he never took money from Leona's restaurant on the night of the shooting.

¶ 21    Gosha acknowledged that prior to his arrest in the instant case he was on parole for an unrelated 2005 aggravated robbery conviction.

¶ 22    He stated that upon his arrest on June 26, 2007, he was taken to a police station at 51st Street and Wentworth. He claimed that before he was taken to an interrogation room, the police spoke to him on a stairway and instructed him that it was in his best interest to "take a robbery," even though he told them that he "didn't take nothing" from the restaurant. Gosha stated that while in the stairway, the police told him that they would charge his younger brother, who was a minor at the time, as an adult for his involvement in the incident and that his "cooperation" would not hurt the petitioner's case.

¶ 23    Gosha testified that once inside the interrogation room he told the police that he took "100-and-some dollars" from the restaurant. At the evidentiary hearing, he explained that he lied about taking the money when he gave this statement to the police because he wanted to help his little brother and the petitioner and was willing to "take that for the team."

¶ 24    Gosha next testified that once he was charged, he spoke to his attorney about the possibility of making a deal with the State. The State offered Gosha 30 years for armed robbery in exchange for his testimony against Wilson and the petitioner. Based on his prior discussions with his own counsel, Gosha had been hoping for 12 years and was "real [*sic*] reluctant" to take

the offer but in the end agreed to the deal.

¶ 25    Prior to trial, Gosha had two separate meetings with the State's attorneys working on the case. The first meeting was led by a female State's attorney with other people present in the room. During this meeting, the State's attorneys "went over [his] testimony, [his] confession," and the deal the State would give him in exchange for his testimony. According to Gosha, after this meeting, he was moved to a witness-protection-type program in jail, which came with benefits and "perks."

¶ 26    Gosha testified that the second meeting, which occurred immediately prior to trial, was only with the female State's attorney. He stated that although someone initially came with her, that individual left before they began speaking. Gosha averred that during this meeting he informed the female State's attorney that he did not commit the robbery. He explained that he was frustrated and asked her why she was "trying to railroad him" by giving him the "max" sentence when he "really didn't do it," but the female State's attorney "didn't really have a response."

¶ 27    Gosha next testified that the same female State's attorney who spoke to him at both meetings was present during the petitioner's trial. Gosha admitted that at trial he testified that he took money from Leona's. Again, he explained that he lied because he thought he was "helping the situation more than hurting it." As Gosha stated: "[I]f I can claim something and it takes the weight off everyone else, then I'm cool, I was cool with that."

¶ 28    Gosha further testified that after he was sentenced for armed robbery, he signed an affidavit stating that his testimony at trial was false and that he told both the police who interrogated him and the State's attorneys on the case that no robbery took place.

¶ 29    On cross-examination, Gosha admitted that the petitioner was his cousin and that he cares

about her and would do anything to help her out, but that he would not come to court and lie for her.

¶ 30    On examination by the court, Gosha explained that when he agreed to testify for the State, it was his belief that the testimony would be detrimental only to codefendant Wilson but not to the petitioner. He also told the court that it was his idea to write an affidavit, but that the petitioner prepared the affidavit for him after which he signed it.

¶ 31    Bobbie Pointdujour, who was a dining room manager at Leona's in 2006, next testified that on the night of the shooting she was out with friends, when she received a voicemail from Justin Twine, who informed her that there was an incident at the restaurant but that "no money was taken" because he left the cash register upstairs. Pointdoujour reiterated that Twine's voicemail stated: "They didn't get the money."

¶ 32    Pointdujour further testified that after receiving this voicemail she immediately went to Leona's, where she found the cash register upstairs on top of the safe. She stated that the cash drawer was full of money but admitted that she did not count it. Pointdujour further testified that the victim had no access to the upstairs safe and that the only person who could open the safe and withdraw money from it was Leona's general manager, Jason Sline.[4]

¶ 33    Pointdujour also averred that a day or two after the incident she received a telephone call from Leona's former general manager, Willie, who told her that he had spoken to Sline, and that he told him to "get them" and they were going to file it on their insurance. She interpreted this to mean "take some money," themselves because they were going to file the loss on Leona's insurance. Pointdujour further testified that she never thought a robbery occurred on the night of the shooting and that she was not aware that any money was missing.

---

[4] Evidence at the petitioner's trial established that Sline had previous convictions for: (1) a federal felony bank robbery and (2) an Illinois felony theft.

¶ 34    Pointdujour also testified that prior to trial, she was contacted by the State and told them both what Twine had said in his voicemail to her and what Willie had told her about Sline taking the money. She also told the State that she did not believe any money was taken by the petitioner or the codefendants.

¶ 35    On cross-examination, Pointdujour testified that prior to the incident at Leona's the petitioner confided in her about inappropriate behavior from the victim towards her, which Pointdujour later witnessed herself. Pointdujour further admitted that there were two cash registers at the restaurant, one in the dispatch and one in the bar, and that she did not see the cash drawer that was found underneath the victim's head on the night of the incident. While she acknowledged that she could not distinguish between the two cash drawers, she claimed that the one which was in dispatch where the victim worked was the one taken upstairs by Twine.

¶ 36    After Pointdujour's testimony, the petitioner introduced into evidence, *inter alia*, a police report according to which Sline told officers that $1700 was missing from the cash drawer and $2,300 was missing from the safe.

¶ 37    At the conclusion of the evidence, the circuit court made the following remark to the State:

> "I don't know if this was anticipated through the testimony or not, but there has been testimony by Mr. Gosha that the [S]tate's attorney that was trying this case could have knowingly put on perjured testimony. Are you going to address this or not?"

After the State responded that it was intending to address the issue with "a credibility argument," the circuit court inquired whether the State should instead call the two State's attorneys who tried the petitioner's case (namely Kathy Van Kampen and Jeff Allen). The State responded that prior to that day it did not know which State's attorneys Gosha was referring to. The court then

9

granted the State's request for a continuance to bring the State's attorneys in as witnesses, noting:

> "There has been—if Mr. Gosha is to be believed, the [S]tate's attorney put on knowingly perjured testimony and we'll be back here again in a couple of years if the Appellate Court believes that's an issue."

¶ 38 At the next hearing date, the State indicated that there were two female State's attorneys who tried the petitioner's case, and that the senior of the two, Kathy Van Kampen, did not have a good recollection of what occurred. The court then asked: "Does she know what the allegations are? The allegations are (unintelligible)—perjury and putting on perjured—knowing perjured testimony?" After the State indicated that Van Kampen was aware of the allegations, the court asked: "And she can't address that?" The State then responded that Van Kampen would feel more comfortable if she could review the transcripts of the case before answering any questions. Over defense counsel's objection, the circuit court granted the State an additional continuance, stating:

> "Again, this came up—this was not pled but it is something that is obviously very concerning and if it's not addressed now, if I was to deny the petition here, I'm sure it's going to come back on this issue. I think this should be put to rest one way or another."

¶ 39 On the following court date, the State called Van Kampen as a witness in the petitioner's postconviction hearing. Van Kampen testified that she worked for the State's Attorney's Office for 22 years and had retired about 5 years ago. She explained that the petitioner's case was tried by three assistant State's attorneys. Van Kampen was the special and first chair. Jeff Allen was the second chair, and Jennifer Bagby was the third. Van Kampen acknowledged that as first chair she was responsible for choosing which witnesses would testify in the case. She also stated that

she made the plea agreement with Gosha and conducted his direct examination at the petitioner's trial.

¶ 40     When asked what she could recall about her pretrial conversations with Gosha, Van Kampen responded that she could not recall "a lot." When asked whether at trial Gosha testified to anything that was different from what he had previously told her, she responded that she "believed" he did not. Over postconviction counsel's objection, Van Kampen was then permitted to respond to the following hypothetical question: "If he had told you that he didn't take money would you've allowed him to testify that he did take money?" Van Kampen responded in the negative, explaining that she "would want [her] witnesses to tell the truth."

¶ 41     On cross-examination, Van Kampen admitted that she could not recall how many conversations she had with Gosha prior to trial. She further admitted that her trial file did not contain any notes regarding those conversations and that her entire testimony regarding what might have transpired in her meetings with Gosha was "completely" based "on [her] own independent memory."

¶ 42     After examination by both parties, the following colloquy took place between the circuit court and Van Kampen:

> "THE COURT: Okay. Ms. Van Kampen. I have a direct question.
>
> THE WITNESS: Yes.
>
> THE COURT: There's been some testimony by Mr. Gosha that you knowingly put on perjured testimony.
>
> THE WITNESS: Judge, I did not.
>
> THE COURT: Do you recall—
>
> You know, I understand this is 11 years ago and you don't remember the specifics—

THE WITNESS: Right.

THE COURT: —of the circumstances. Would you put on knowing perjured testimony?

THE WITNESS: I would never put on perjury testimony, nor have I have done so, Judge."

¶ 43    After Van Kampen's testimony the State called former assistant State's attorney, Jennifer Bagby, who was the third chair on the petitioner's trial. Bagby testified that she worked for the State's Attorney's Office between 2000 and 2017. She acknowledged that during the petitioner's trial, Van Kampen acted as first chair, and Jeff Allen as second. She also acknowledged that, as first chair, Van Kampen would have been responsible for final decisions and strategy.

¶ 44    Bagby testified that she met Gosha with Van Kampen and Allen on at least one occasion prior to trial. She never met with Gosha alone. The one conversation she recalled with Gosha involved Van Kampen asking Gosha some questions. As Bagby explained: "I believe it was conversational and explaining—and discussing with him how it would be in testifying at trial, the types of questions she would ask, where he would sit. General preparation for trial."

¶ 45    Bagby testified that Gosha never told her or anyone else in her presence that he did not take money from the register at Leona's. She further stated that Gosha's trial testimony was consistent with what he had previously told her. In addition, she was not aware of any perjury at the petitioner's trial.

¶ 46    On cross-examination, Bagby admitted that she did not have a trial file for the petitioner's case and that in preparing for the evidentiary hearing she reviewed only her jury book, which exclusively included notes she took during trial. Bagby also stated that she did not take any notes while speaking with any witnesses in preparation for trial.

¶ 47    On examination by the court, Bagby testified that she "believed" Gosha was represented

by an attorney. She could not recall whether the attorney was present during the State's attorneys' conversations with him but stated that if Gosha had an attorney "it would seem to [her] that the attorney would've been present for any conversations."

¶ 48    In closing arguments, postconviction counsel argued that there was "ample evidence" presented that no armed robbery occurred on the evening of the shooting. Instead, counsel argued that it was much more plausible that either Leona's server, Twine, or the general manager, Sline, who were both present at Leona's during the altercation, used the situation to their favor and took money from the cash register, contemporaneously with or immediately after the shooting.

¶ 49    Postconviction counsel further argued that a *Brady* violation occurred when the State failed to tender to trial counsel any statements made to them by Gosha and Pointdujour regarding that no money was taken. When postconviction counsel argued that Van Kampen's testimony at the evidentiary hearing was less than forthcoming and that it was plausible that she forgot to tell defense counsel that Gosha was having some doubts and or was "saying some other things," the court interjected:

> "Ok. Let me just stop you now. That's a pretty serious allegation made against an attorney. Wouldn't you—would you agree.
>
> ***
>
> I mean, if in fact a person did in fact do that not only would the person suffer a complaint, most likely would be disbarred. Would you not believe what the—particularly since the professional rules of conduct require the prosecutor to not seek conviction but to seek justice; correct?"

The court further noted: "We're talking about someone deliberately putting on perjury testimony. I mean, it's—I don't know how anyone could ever justify that if in fact it was—if it was

something that happened."

¶ 50     In response, in its closing argument, the State maintained that the court had heard the testimony of the State's attorneys on the petitioner's case and that "[t]hey did not lie." As the State argued: "They were credible and what they said to you made sense."

¶ 51     After taking the matter under advisement, the circuit court dismissed the petitioner's postconviction petition. Relevant to this appeal, with regard to the State's alleged knowing reliance on perjured testimony, the court found the State's attorneys believable. The court stated that both State's attorneys were "seasoned" and therefore aware of the implications of willfully putting on perjured testimony and hiding evidence from the defense. Moreover, the court explicitly found that while Van Kampen could not recall the specifics of the petitioner's case, she "insisted that she would never put on perjur[ed] testimony nor has she ever done so in her career." The court therefore found that "no perjury occurred" and that there was no *Brady* violation because there was "nothing to tender to the defense."

¶ 52     The petitioner now appeals.

¶ 53                              II. ANALYSIS

¶ 54     On appeal, the petitioner does not challenge the dismissal of her postconviction petition. Instead, she solely argues that she received unreasonable assistance of postconviction counsel at the third-stage evidentiary hearing. She therefore asks this court to remand the matter to the circuit court for another evidentiary hearing with new postconviction counsel.

¶ 55     At the outset we note that the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2016)) provides a means by which a criminal defendant may challenge her conviction on the basis of a "substantial deprivation of federal or state constitutional rights." *People v. Tenner*, 175 Ill. 2d 372, 378 (1997); *People v. Cotto*, 2016 IL 119006, ¶ 26; *People v. Tate*, 2012

IL 11214, ¶ 8; *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). The Act provides a three-stage process for postconviction relief. *Cotto*, 2016 IL 119006, ¶ 26; see also *People v. Johnson*, 2017 IL 120310, ¶ 14.

¶ 56    At the first stage, the circuit court must independently review the petition and determine whether the allegations therein, taken as true, demonstrate a constitutional violation or whether they are frivolous or patently without merit. *Cotto*, 2016 IL 119006, ¶ 26; 725 ILCS 5/122– 2.1(a)(2) (West 2016); *Tate*, 2012 IL 112214, ¶ 9. If, as here, the court takes no action on the petition within 90 days after it is filed and docketed the petition is advanced to the second stage, where counsel is appointed to represent the petitioner and the State may file responsive pleadings. *Cotto*, 2016 IL 119006, ¶ 26. At the second stage, the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. 725 ILCS 5/122-6 (West 2016); *Tate*, 2012 IL 11214, ¶ 10. If no such showing is made, the petition is dismissed. *Tate*, 2012 IL 11214, ¶ 10.

¶ 57    If, however, as here, the petition makes a substantial showing of a constitutional violation, it is advanced to the third stage, where the circuit court conducts an evidentiary hearing to determine the validity of the petition's factual allegations. 725 ILCS 5/122-6 (West 2016); *People v. Edwards*, 197 Ill. 2d 239, 246 (2001). At this stage, unlike the previous ones, the petitioner's allegations are not presumed to be true, and the petitioner must prove her claim by a preponderance of the evidence. *People v. Domagala*, 2013 IL 113668, ¶ 35; *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006); *People v. Carter*, 2017 IL App (1st) 151297, ¶ 132.

¶ 58    During the evidentiary hearing, the circuit court has wide discretion in deciding what evidence to consider. *People v. Williams*, 2017 IL App (1st) 152021, ¶ 22. Moreover, because it is in the best position to observe the demeanor of the testifying witnesses, the circuit court, as the

fact finder, is vested with the responsibility of making credibility determinations, resolving conflicting testimony and weighing the evidence offered. *Domagala*, 2103 IL 113688, ¶ 34; *People v. Reed*, 2020 IL 124940, ¶ 51.

¶ 59    In reviewing the dismissal of a petition after a third-stage evidentiary hearing, the reviewing court may not reverse the circuit court's decisions regarding credibility determinations or fact-finding unless they are manifestly erroneous. *People v. Coleman*, 2013 IL 113307, ¶ 98; *Pendleton*, 223 Ill. 2d at 473; *English*, 2013 IL112890, ¶ 23.

¶ 60    A postconviction petitioner does not have a constitutional right to counsel. *People v. Cotto*, 2016 IL 119006, ¶ 45; *People v. Suarez*, 224 Ill. 2d 37, 42 (2007). Instead, the Act provides that an indigent petitioner has a right to the assistance of appointed counsel only at the second and third stages of postconviction proceedings. 725 ILCS 5/122-4 (West 2006). Because appointment of counsel is purely a matter of "legislative grace" the extent of counsel's representation is determined solely by the Act. *Cotto*, 2016 IL 119006, ¶ 45; *People v. Custer*, 2019 IL 123339, ¶ 30. Our supreme court has held that under the Act a petitioner is entitled only to a "reasonable" level of assistance. *Id.*

¶ 61    While our supreme court has delineated the parameters of "reasonableness" for purposes of second stage postconviction proceedings, [5] stating that it is "significantly lower than the one mandated at trial by our state and federal constitutions" (*Custer*, 2019 IL 123339, ¶ 30), it has not yet done so for counsel's conduct at the third stage evidentiary hearing. However, our appellate courts addressing the issue have repeatedly held that while the "reasonable" level of

---

[5] According to our supreme court to provide a "reasonable" level of assistance at the second stage of postconviction proceedings, counsel must perform specific duties as articulated by Illinois Supreme Court Rule 651(c) (Ill. S. Ct. R. 651(c) (eff. July 1, 2017)). See *Custer*, 2019 IL 123339, ¶ 32; see also *People v. Malone*, 2017 IL App (3d) 140165, ¶ 10. These duties include: (1) consulting with the petitioner (either by mail or in person) to ascertain his contentions of deprivation of constitutional rights; (2) examining the record of the trial proceedings; and (3) making any amendments to the *pro se* petition that are necessary for an adequate representation of the petitioner's contentions. See Ill. S. Ct. R. 651(c) (eff. July 1, 2017).

assistance required under the Act is not coextensive with the level of assistance required of trial counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), the *Strickland* standard is nonetheless an "essential" point of "comparison." *People v. Hotwagner*, 2015 IL App (5th) 130525, ¶ 37; see *e.g.*, *People v. Pabello*, 2019 IL App (2d) 170867, ¶ 28. As such, it "stands to reason that if postconviction counsel's performance cannot be deemed deficient under *Strickland*, it cannot be said that counsel failed to provide the reasonable level of assistance required under [the lesser standard of] the Act." *Hotwagner*, 2015 IL App (5th) 130525, ¶ 37; see also *People v. Watson*, 2022 IL App (5th) 190427, ¶ 48; *People v. Soto*, 2022 IL App (1st) 192484, ¶ 162 (citing *People v. Zareski*, 2017 IL App (1st) 150836, ¶¶ 58-59).

¶ 62　　Under *Strickland*, the petitioner must establish both: (1) that her counsel's conduct fell below an objective standard of reasonableness; and (2) that she was prejudiced as a result of counsel's conduct, *i.e.*, that "but for" counsel's deficient performance there is a reasonable probability that the outcome of her proceedings would have been different. *Strickland*, 466 U.S. at 687-94. "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result of [the proceedings] unreliable or fundamentally unfair." *People v. Evans*, 209 Ill. 2d 194, 220 (2004); see also *Plummer*, 344 Ill. App. 3d at 1019 (citing *Strickland*, 466 U.S. at 694)).

¶ 63　　We review the question of whether postconviction counsel provided reasonable assistance under the Act, *de novo. People v. Wallace*, 2018 IL App (5th) 140385, ¶ 31.

¶ 64　　In the present case, on appeal, the petitioner asserts that her postconviction counsel was unreasonable because he failed to investigate and to discover publicly available, outcome determinative impeachment evidence demonstrating that the lead State's attorney at her trial,

Kathy Van Kampen, lied to the circuit court during the evidentiary hearing when she testified that she had never put on perjured testimony in the past. The petitioner asserts that a simple Google search of Van Kampen's name would have revealed that she had in fact done so in the case of Maurice Patterson (case No. 02 CR 13473(01)) who spent eight years in prison for a murder he did not commit on the basis of similarly perjured testimony. The petitioner asserts that the highly publicized nature of the Maurice Patterson exoneration proceedings, which detailed Van Kampen's misconduct in that case, reveal that postconviction counsel failed to conduct even the most basic investigation into Van Kampen's past, thereby prejudicing the outcome of her evidentiary hearing.

¶ 65    In support, the petitioner cites numerous publicly available articles, which purport to describe what transpired in the Maurice Patterson case. In addition, by way of example as to what was readily available and therefore potentially discoverable by postconviction counsel, the petitioner attaches three articles as an appendix to her brief. These include: (1) a 2012 entry titled "Maurice Patterson" on the National Registry of Exonerations; (2) a December 9, 2015, article in the Injustice Watch detailing the Patterson case, and (3) an October 10, 2010, Daily Law Bulletin article titled "Man Gains Freedom Due to Undisclosed Evidence at Trial."

¶ 66    According to the petitioner, these articles reveal that in the Patterson case, DNA testing of a knife found at the murder scene revealed positive traces of the victim's blood and the blood of another individual who was in the State's database of convicted offenders, but the information was never transmitted from the State to Patterson's defense counsel. Instead, before trial, State's attorney Van Kampen told the judge that the knife did not have the victim's blood on it, and that it was not connected to the murder. Moreover, during Patterson's trial, Van Kampen permitted a police detective to testify that the victim's blood was not on the knife, and later relied on this

information in closing argument. The petitioner therefore asserts that Van Kampen's testimony at the petitioner's third-stage evidentiary hearing that she would not, and has never, put on perjured testimony was patently false, and that it prejudiced the outcome of her proceedings.

¶ 67    The State does not challenge the public availability of the information relied on by the petitioner. Nor does it disagree with the petitioner's position that the attached articles "appear to be germane" to her claim regarding postconviction counsel's performance. Instead, the State initially and briefly asserts that the articles should not be considered because they are *dehors* the record. The State then, however, proceeds to argue in great detail that the articles themselves do not conclusively establish that Van Kampen suborned perjury in the Patterson case. According to the State, at best, the articles show that Van Kampen previously committed an inadvertent *Brady* violation. The State therefore argues that postconviction counsel's failure to discover or introduce such impeachment evidence at the petitioner's evidentiary hearing was not prejudicial.

¶ 68    At the outset, we note that because the petitioner's argument regarding counsel's unreasonable representation is entirely premised on evidence not contained in the record on appeal, we are unable to meaningfully review her claim. This court has repeatedly held that absent a stipulation by the parties, documents not otherwise before the court, but attached to an appellate brief are not part of the record on appeal and this court "cannot consider evidence that is not part of the record." *People v. Garcia*, 2017 IL App (1st) 133398, ¶ 35; *People v. Heaton*, 266 Ill. App. 3d 469, 476 (1994).

¶ 69    Moreover, contrary to the petitioner's request we may not "take judicial notice of critical evidentiary material that was not presented to and considered by the fact finder." *People v. Boykin*, 2013 IL App (1st) 112696, ¶ 9. This is particularly true here, where the evidence that the petitioner asks us to notice implicates the credibility of a witness at the evidentiary hearing.

19

See *People v. Cline*, 2022 IL 126383, ¶¶ 32-22 (It is not "permissible for a reviewing court to take judicial notice of material that was not considered by the trier of fact in weighing the credibility of a *** witness's testimony.") Because it is the circuit court's responsibility to make factual and credibility determinations at the evidentiary hearing, we cannot consider evidence for the first time on appeal that the circuit court did not review. If we did so, we would be improperly interjecting impeachment evidence into the record that was not subject to cross-examination or consideration by the circuit court. See *e.g.*, *People v. Mehlberg*, 249 Ill. App. 3d 499, 531-32 (1993) (not considering studies for the first time on appeal because they were "an attempt to interject *** evidence into the record" that was not subject to cross-examination or considered by the trial court.)

¶ 70    Moreover, as the parties' arguments on appeal demonstrate, their interpretations of the facts contained in the documentary evidence, which the petitioner wishes us to notice, are vastly different and would require us to make factual determinations for the first time on appeal. None of this is appropriate for appellate review.

¶ 71    Nonetheless, because we are troubled by the seriousness of the allegations raised by the petitioner regarding the State's knowing subornation of perjury, not once, but twice, first at the petitioner's trial and now at her third stage postconviction evidentiary hearing, in the interest of justice we remand this issue to the circuit court so that the information raised in this appeal can be properly addressed by the circuit court. In that respect, we find relevant that it was the circuit court who *sua sponte* raised this issue for the first time at the evidentiary hearing, such that the parties were given very little time or opportunity to properly research, brief or address the issue in any meaningful sense.

¶ 72    Moreover, because the circuit court is already familiar with the issue, we see no reason to

waste any more judicial resources by delaying this already protracted postconviction proceeding by dismissing this appeal and requiring the petitioner to file a successive postconviction petition, in which to raise the State's subornation of perjury with the newly discovered impeachment evidence that it now wishes us to review.

¶ 73 Accordingly, we find that in the interests of justice the matter should be reversed and remanded to the circuit court for a new evidentiary hearing only on the issue of the State's knowing subornation of perjury, so that the parties may have an opportunity to fully brief and argue its merits.

¶ 74 III. CONCLUSION

¶ 75 For the aforementioned reasons, we reverse and remand to the circuit court with instructions.

¶ 76 Reversed and remanded with instructions.